STATE of Iowa, Appellee,

v.

Charles Peter PATERNO, Appellant.

No. 65202.

Supreme Court of Iowa.

Aug. 26, 1981.

Paul Rosenberg of Rosenberg & Margulies, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Roxann M. Ryan, Asst. Atty. Gen., and Dan L. Johnston, Polk County Atty., for appellee.

Considered by REYNOLDSON, C. J., and UHLENHOPP, McGIVERIN, LARSON, and SCHULTZ, JJ.

UHLENHOPP, Justice.

In this appeal we pass upon the validity of a search warrant.

Some of the facts in the case relate to the issuance of the search warrant and some relate to the claims of defendant Charles Peter Paterno that the warrant was stale and that the applicant for the warrant intentionally withheld material information from the issuing judicial officer.

Officer Craig Hamilton of the Des Moines Police Department Narcotics Bureau testified at a subsequent hearing that "we have been working on Charles Paterno since September 28, 1979. We have received numerous complaints. We have talked to people on the street reference Charles Paterno selling to juveniles, so forth."

After the police had pursued the investigation for some time, Hamilton arranged for a female confidential informant to go to defendant's home at 3323 East 8th Street in Des Moines on the evening of June 19, 1979. Defendant testified at the subsequent hearing regarding those happenings:

Q. And will you describe this contact? A. She was walking up in front of my house and she asked if she could use the phone.

Q. Where were you sitting at this time? A. On my porch.

Q. What did you say to her? A. Sure.

Q. Then what happened? A. She came up and told me about her boyfriend and their fighting, and she wanted to use the phone because her boyfriend dropped her off and didn't come back and get her.

Q. What did you say? A. I told her she could use the phone. She was sort of dressed up. I asked her, you know, where she was going and she said they was going out to eat, and I asked her if she was hungry and she said yeah, and I called Domino's and got something to eat.

Q. You called some place, is that what you said? A. (Witness nodded his head.)

Q. Did you offer this girl any drugs? A. I asked her if she smoked and she said yeah, and I asked her if she wanted to smoke a bowl.

Q. Were you in the house at this time? A. No, I was out on the porch.

Q. And what did she say when you asked her if she wanted to smoke? A. She said sure.

Q. What did you do then? A. We went in the house and she smoked some hash.

Q. Where were you in the house; what room? A. In the living area.

Q. Were there any drugs in plain view at that time? A. The hash.

. . . .

Q. How much hash was there? A. Measure the size of the chunk, it would be about as big as a dime.

Q. Was also there some marijuana there she could have seen? A. It wasn't visible but I took it out.

Q. Took it out where? A. Out of the cupboard in the kitchen.

Q. Did you show it to her? A. Yes.

Q. Sometime on the evening of June 19th did you become suspicious of this girl working for the police department as an undercover informant? A. Yes.

Q. Why did you become suspicious? A. Well, at first I became suspicious just the way she came up to my house, and then because the person that delivered the food from Domino's recognized her from being in Domino's the weekend before and asking him for drugs.

Q. Did you accuse her—did you confront her with your suspicions? A. Yes; before the food was delivered and then afterwards.

Q. Draw back a little from the microphone. Did you confront her with your suspicions? A. Yes.

Q. What did you say to her? A. I asked her if she was a narc and she said no. Then I asked her if she worked for them and she said no.

Q. But did you still believe at that time that she did still work as an undercover agent for the police department? A. Would you repeat that? I didn't hear.

Q. Strike that. Did you have a conversation with her concerning your intent to get rid of some drugs that were in your house? A. Yes.

Q. Would you describe that conversation? A. While she was eating I told her: "You make me very nervous. I think you're a narc." I said, "For the little drugs I have in my house, I'm not going to get busted for this, because I'm going to flush them down the stool." And while she was sitting there I went

and flushed them down the stool, and I asked her if she could eat and leave. And she went upstairs after I went to flush them before she left and then she left.

Q. Did you in fact flush some drugs down the toilet? A. Yes.

Q. What did you flush down the toilet? A. The marijuana.

Q. Was she aware that you flushed this down the toilet? A. Yes.

Q. What happened to the hash that was there? A. She smoked it.

Q. So by the time this girl left that evening all the drugs that she had seen had been destroyed? A. Yes.

After the informant left defendant's home, she reported these happenings to Hamilton.

Hamilton took up this investigation with his superiors, and thereafter prepared and executed an affidavit for a search warrant. On June 21, 1979, he presented the affidavit to a judicial officer. In it he swore he had good reason to believe that personal property was being used or held at defendant's home (giving the address) so as to render that place subject to a search warrant; the property was used as a means to commit a public offense; the property was in possession of a person with intent to commit a public offense, or delivered to another for the purpose of concealing it; other property existed which was relevant and material as evidence in a criminal prosecution; the property was described as "marijuana, a schedule I controlled substance in violation of chapter 204.401 State Code of Iowa and any/all other controlled substances held in violation of chapter 204.401 State Code of Iowa"; the property was believed to be in the possession of Charles Paterno; Hamilton had observed a motor vehicle registered to Charles Paterno going to and from 3323 East 8th Street, and had seen Paterno go into that address on several occasions; Hamilton had that address under surveillance and observed foot and motor traffic to it on several occasions; Paterno paid for the utilities at that address as shown by checks at the light and water companies; on June 19, 1979, defendant introduced himself to an informant as Charles Paterno and

invited her into the house to get high; the informant observed marijuana and hash in the house; and Paterno offered an illicit drug to the informant. Hamilton swore to additional facts showing the reliability of the informant. The judicial officer found probable cause and issued a search warrant.

Officers executed the warrant five days later, on June 26, 1981. *See* § 808.8, The Code 1979 ("A search warrant shall be executed within ten days from its date"). Hamilton's explanation of the five-day period was this:

Q. Is there any particular reason for the delay, five days? A. Well, we didn't have the manpower. I was the one that issued the search warrant so I was more or less in charge of the investigation. We were also working on a quarter ounce cocaine deal in the Woodland area. We were just really busy. We had a lot of different investigations going.

Q. What I'm getting at, Officer Hamilton, did you consciously sit on the warrant and wait to execute it till a time you thought you might find a large supply of drugs in Mr. Paterno's residence? A. No.

With regard to the execution of a search warrant counsel asked:

Q. Are these usually served promptly or is there some delay involved?

Hamilton answered:

A. Well, it really varies. Some search warrants we do. I actually never have known a search warrant, since I have been in narcotics, where we'd wait until we thought a big load would come in. It just doesn't happen. Sometimes we do it right away when we have the time, when we have the manpower. Sometimes we wait the maximum ten days, because on that investigation—it just varies.

Also:

Q. Did you serve this warrant on Mr. Paterno's residence in the most practicable time? A. Yes, we did.

The search netted inter alia a scale with weight, a yellow smoking pipe, two sea-shell type smoking pipes, two glass smoking pipes, two containers of manitol, three one-gram bindles of cocaine, and three seven-gram packages containing cocaine.

The county attorney charged defendant with possession of a controlled substance with intent to deliver. Defendant moved to suppress the items seized in the search, and the district court, after a hearing, overruled the motion. A jury found defendant guilty, and the trial court sentenced him.

Defendant appealed, urging two contentions: the presence of marijuana and hash in defendant's home on June 19, 1979, did not give probable cause to believe that it would be there two days later when the warrant was issued or five days still later when the warrant was executed; and Hamilton obtained the warrant by intentional and material misrepresentation by failing to tell the judicial officer that defendant was alerted to the investigation and destroyed the contraband.

■ I. Did probable cause exist to believe that a controlled substance was in the home on June 21 and 26? We described probable cause as follows in *State v. Post,* 286 N.W.2d 195, 199 (Iowa 1980) (citations omitted):

In determining whether there is probable cause to issue a search warrant, the test is "whether a person of reasonable prudence would believe a crime was being committed on the premises to be searched or evidence of a crime was being concealed there." The facts must establish probable cause that the crime or evidence is presently being committed or concealed at the place to be searched and cannot merely establish that there was probable cause at some time in the past.

*See also State v. Bean,* 239 N.W.2d 556, 559–60 (Iowa 1976) ("whether a person of reasonable prudence would believe a crime was being committed on the premises to be searched or evidence of a crime was being concealed there"). Time alone is not conclusive, *Post,* 286 N.W.2d at 201, and the staleness issue is resolved by consideration of all the factors present in the particular situation. *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976);

*Sgro v. United States,* 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932).

The information presented to the judicial officer in this case dealt with the presence of controlled substances on a single instance; in such cases probable cause ordinarily does not continue for an extended period of time. *Bastida v. Henderson,* 487 F.2d 860, 864 (5th Cir. 1973); W. La-Fave, *Search and Seizure* § 3.7, at 684 (1978) ("a single instance of possession or sale of some form of contraband, will support a finding of probable cause only for a few days at best"). On the other hand, probable cause does not require absolute proof that the contraband was in the place in question at the very moment the warrant was issued and executed; such a rule would require an impossibility. LaFave, § 3.7, at 684.

Upon review of this record, we conclude as the District Judge did at the suppression hearing that probable cause existed at the times of the issuance and execution of the warrant. We reject defendant's first contention.

II. Did Hamilton obtain the search warrant by intentional or material misrepresentation? We stated in *State v. Boyd,* 224 N.W.2d 609, 616 (Iowa 1974):

> After a review of the various, and sometimes conflicting, conclusions of the other courts, we now adopt a rule permitting a defendant to inquire into the truth of the representations upon which a search warrant has been issued only upon a preliminary showing under oath that an agent or representative of the state has: (1) intentionally made false or untrue statements or otherwise practiced fraud upon the magistrate; or (2) that a material statement made by such agent or representative is false, whether intentional or not.

> If defendant proves either of the above by a preponderance of the evidence, the search warrant shall be invalidated and the evidence seized thereunder shall be inadmissible.

*See also Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2683–84, 57 L.Ed.2d 667, 682 (1978). Under proper facts, a failure to disclose information to an issuing judicial officer can constitute misrepresentation. *United States v. Lefkowitz,* 464 F.Supp. 227, 233 (C.D.Cal.1979) ("provided that the omission produces the same practical effect as does an affirmative statement, i. e., that it leads to a misconception"); *see also Cruse v. State,* 584 P.2d 1141 (Alaska 1978). While we are limited to considering the facts presented to the issuing judicial officer in determining whether probable cause existed, *State v. Rockhold,* 243 N.W.2d 846, 848–49 (Iowa 1976), in determining whether misrepresentation was intentional or material the surrounding facts are relevant and may be considered. *State v. Post,* 286 N.W.2d 195, 201–02 (Iowa 1980).

Hamilton knew the informer said that defendant was going to flush the marijuana down the stool, that defendant went upstairs with it, and that he returned with an empty baggie. Hamilton did not tell this to the judicial officer. But Hamilton had considerable information on the other side of the issue, running back in time, which he likewise did not tell the judicial officer. Moreover, with the prices of controlled substances as shown by the transactions in the decided cases, an inference is reasonable that defendant may have hidden rather than destroyed the marijuana; we are not impressed with his credibility. In addition, Hamilton testified regarding the facts as to the alleged destruction of the marijuana:

Q. You did not include those facts in your subsection capital B of letter No. 4, is that correct? A. That's correct.

Q. Why didn't you though? Why did you not include those facts? A. Well, I just wanted to include what I thought was important to the magistrate; what was relevant to the case.

Q. Did you intend to practice any type of fraud upon the magistrate? A. No.

Q. Did you consciously withhold facts which you thought might be detrimental to your obtaining search? A. No, I did not.

Q. What is your thought process when you go to supply facts to a magistrate, specifically facts provided to you by an informant? What type do you look for and what type of facts do you present?
A. I look for facts that would give myself a feeling that we had probable cause to enter a residence; facts that are truthful; that the magistrate can look at and absorb; and facts that will suffice a search warrant. It has to be a good lot of facts as far as I'm concerned for a type of search warrant.

■■ Defendant has the burden of establishing intentional or material misrepresentation, by a preponderance of the evidence. *Post*, 286 N.W.2d at 201 (Iowa 1979). Upon consideration of all the relevant evidence on this issue, we again agree with the District Judge. Defendant has not established his contention of intentional or material misrepresentation.

We thus uphold the judgment and sentence.

AFFIRMED.