**STATE of Iowa, Appellee,**

v.

**James Byron GREEN, Appellant.**

**No. 94–1050.**

Supreme Court of Iowa.

Nov. 22, 1995.

Linda Del Gallo, State Appellate Defender, and Ahmet S. Gonlubol, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Mary Tabor, Assistant Attorney General, and Paul L. Martin, County Attorney, for appellee.

Considered by McGIVERIN, C.J., and LARSON, LAVORATO, NEUMAN, and ANDREASEN, JJ.

NEUMAN, Justice.

The State charged James Green with murder after a search of his residence yielded the decomposed body of his former girlfriend, Rosemary McGivney. Green challenged the search by a pretrial motion to suppress. The district court, analyzing the sufficiency of the warrant in terms of proof necessary to uphold an administrative search for a missing person, overruled the motion. The case then proceeded to a bench trial on stipulated evidence, including Green's detailed confession. The court found him guilty of second-degree murder in violation of Iowa Code sections 707.1 and 707.3 (1993).

On appeal, Green renews his challenge to the issuance of the search warrant. He contends that (1) the search of his home was authorized pursuant to a criminal search warrant, not an administrative warrant, and (2) the facts before the magistrate were insufficient to support a probable cause finding. Although we agree the sufficiency of the warrant must be measured by criminal—not administrative—warrant standards, we believe the record amply supports the issu-

ance of a warrant here. We, therefore, affirm.

## I. *Facts.*

Green met Rosemary McGivney in 1989. They became romantically involved and eventually moved into a house in Mason City. Both had a history of mental illness. Their relationship was described as "stormy."

According to Green's statement to the police, Rosemary announced on February 5, 1993, that she was "fed up" with Green and planned to leave him. Green followed her to the back door, begging her to stay. As he tried to kiss her, she fell down the back stairs, landing in the basement. She appeared unconscious. Green thought about calling an ambulance, but soon began hearing voices telling him to kill her. He then grabbed a snow shovel and clubbed her repeatedly about the head. Evidence collected by the medical examiner revealed that Rosemary died, not from the fall, but from blows to her head.

Green lived with the corpse in his basement for the next seven months. He moved it under the stairs and covered it with a blanket. Friends who stopped by commented about the odor; Green passed it off as "water in the basement."

Meanwhile, when Rosemary's relatives inquired about her whereabouts, Green concocted a story that she had left with another man in a pickup truck. This apparently did not strike Rosemary's mother, Mary Van Hamme, as unusual. By mid-August, however, Van Hamme became concerned that her daughter might have "been thrown over a cliff someplace or something." She contacted the Mason City police who agreed to investigate.

Officer Gregory Scott went to Green's residence to inquire about Rosemary. Green told Scott that he had not seen her since February, when she left with another man. Green refused to permit a search of his residence. Before leaving, Scott noticed that Rosemary's car was in the garage. Green explained that he had paid for the car and McGivney left it behind when she went with the other man. Scott returned to the police station and relayed this information to Lieutenant Ellingson and Officer Frank Stearns. Because Stearns knew Green, he thought Green might let him look around. Stearns and Scott returned to Green's residence, but Green gave Stearns the same story. When Stearns asked if he could look inside the house, Green became extremely agitated, shouted obscenities, and again refused to consent to a search.

Officer Scott then assisted Van Hamme in filling out a missing persons report. He also applied for a search warrant, attaching a copy of the missing persons report and a report prepared by Lieutenant Ellingson. The application was presented to a magistrate, who treated it as one for a criminal search warrant. The magistrate found there was probable cause to search and issued a warrant.

On the evening of August 15, 1993, police executed the warrant. Green was not at home. Officers found McGivney's decomposed body in the basement underneath some trash bags. Green arrived home while the officers were conducting their search, but after the body had been found. Green was upset that his home was being searched; the police told him they had a warrant. While being patted down for weapons, Green suddenly blurted out, "I f---ing murdered Rosemary. I f---ing murdered her, so no big deal." Green was then arrested and taken to the police station where he gave statements relating the details of McGivney's murder.

## II. *Motion to Suppress.*

Green filed a pretrial motion to suppress claiming (1) the warrant was issued without probable cause that a crime had been committed, (2) that no exigent circumstances existed to justify a search without probable cause, and (3) material misrepresentations by the officers formed the basis for the issuing magistrate's decision, rendering it invalid. Only the first and third claims are renewed on appeal.

■ A. *Probable Cause.* Resolution of the case is complicated by the fact that Mary Van Hamme and the investigating officers seemed uncertain, in retrospect, about

whether the warrant was sought to collect evidence of a crime or merely to gain clues to Rosemary's whereabouts. The warrant application recited that Rosemary's belongings, located at Green's house and garage, were subject to search as property "used or possessed with the intent to be used as the means of committing a public offense," "concealed to prevent an offense from being discovered," or "relevant and material as evidence in a criminal prosecution." The application was treated by the magistrate as one for a criminal warrant under Iowa Code section 808.3. Yet at the hearing on the motion to suppress, both Mary Van Hamme and Officer Stearns stated that when the application was submitted, neither believed that a crime had been committed.

 The district court attempted to reconcile this inconsistency by scrutinizing the warrant, not "within the context of a criminal search warrant under section 808.3 ... but rather [ ] within the parameters of a noncriminal search warrant issued under section 808.14. . . ." Section 808.14 states:

> The courts and other appropriate agencies of the judicial branch of the government of this state may issue administrative search warrants, in accordance with the statutory and common law requirements for the issuance of such warrants, to all governmental agencies or bodies expressly or impliedly provided with statutory or constitutional home rule authority for inspections to the extent necessary for the agency or body to carry out such authority, to be executed or otherwise carried out by an officer or employee of the agency or body.

This characterization is significant because administrative warrants are held to a lesser standard of probable cause than criminal search warrants. *Camara v. Municipal Court*, 387 U.S. 523, 537–38, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930, 940 (1967). The purpose of such a warrant is not to discover evidence of crime but to secure compliance with code standards. *Id.* Thus a finding of probable cause turns on the reasonableness of the inspection, not on proof that a violation would be found in a particular location. *Id.* at 534–35, 87 S.Ct. at 1734, 18 L.Ed.2d at

939. This test involves merely "balancing the need to search against the invasion which the search entails." *Id.* at 537, 87 S.Ct. at 1735, 18 L.Ed.2d at 940.

A number of cases have upheld the use of such searches by police officers. *See, e.g., Cady v. Dombrowski*, 413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706, 718 (1973) (officer's concern for public safety justified search of car); *South Dakota v. Opperman*, 428 U.S. 364, 375, 96 S.Ct. 3092, 3100, 49 L.Ed.2d 1000, 1009 (1976) (caretaking search of lawfully impounded automobile upheld); *State v. Mitchell*, 498 N.W.2d 691, 693–94 (Iowa 1993) (officer's stop for equipment vehicle violation upheld even though not based upon suspicion of criminal activity). Underlying these decisions is the rationale that police officers' duties extend beyond crime detection and investigation to what is sometimes referred to as the "caretaking function" of the police. *Mitchell*, 498 N.W.2d at 694. At least one case has extended this "caretaking function" to the search of a private residence for a missing person. *State v. Beede*, 119 N.H. 620, 406 A.2d 125, 130 (1979). Although *Beede* involved a warrantless search, the New Hampshire court found the facts (not dissimilar from the ones before us) "would have justified a person of ordinary caution in the belief that it would be reasonable to enter for the non-criminal purpose of looking for the defendant or [the victim]." *Id.*

 The district court's reliance on this line of authority is seriously weakened, however, by the fact that our missing persons statute, Iowa Code chapter 694, grants the police no authority to conduct "inspections." The statute merely authorizes the collection and dissemination of reports, and the establishment of a missing person information clearinghouse. *See* Iowa Code §§ 694.2–.4, .10. Without statutory authority to conduct inspections for missing persons, no basis for the issuance of an administrative warrant under Iowa Code section 808.14 exists. *See Meier v. Sulhoff*, 360 N.W.2d 722, 726 (Iowa 1985) ("Because there is no common-law right to issue a search warrant ... we lack the authority to expand by judicial fiat the purposes fixed by the legislature for which

search warrants may lawfully issue."); *accord Fisher v. Sedgwick,* 364 N.W.2d 183, 184 (Iowa 1985).

■ We may, however, uphold the district court's decision on any basis existing in the record, even though different from the one relied upon by the court. *Collins v. State,* 477 N.W.2d 374, 376 (Iowa 1991); *State v. Hawkins,* 356 N.W.2d 197, 199 (Iowa 1984). We thus turn to the facts pertinent to the issuance of a criminal warrant under section 808.3.

■ "It is axiomatic that search warrants are to issue only upon a finding of 'probable cause.'" *State v. Seiler,* 342 N.W.2d 264, 266 (Iowa 1983). The test for probable cause is whether a reasonably prudent person would believe that a crime has been committed on the premises to be searched or evidence of a crime is being concealed there. *Id.; State v. Seager,* 341 N.W.2d 420, 426–27 (Iowa 1983). A probable cause finding must rest on "a nexus between criminal activity, the things to be seized and the place to be searched." *State v. Weir,* 414 N.W.2d 327, 330 (Iowa 1987).

■ Reviewing courts are obliged to give great deference to a magistrate's finding of probable cause to search. *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527, 546–47; *reh'g denied,* 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983); *State v. Bishop,* 387 N.W.2d 554, 558 (Iowa 1986). Our review is de novo, but our task is not to make an independent determination of probable cause, but only to determine whether the issuing magistrate had a "'substantial basis for ... conclud[ing] that probable cause existed.'" *Bishop,* 387 N.W.2d at 558 (quoting *Gates,* 462 U.S. at 238–39, 103 S.Ct. at 2332, 76 L.Ed.2d at 548). A magistrate makes this determination based upon the "totality of the circumstances." *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332, 76 L.Ed.2d at 548. Close cases must be resolved in favor of upholding warrants, as public policy is promoted by encouraging officers to seek them. *Id.* at 236–37, 103 S.Ct. at 2331, 76 L.Ed.2d at 547; *State v. Woodcock,* 407 N.W.2d 603, 606 (Iowa 1987); *Bishop,* 387 N.W.2d at 558. Furthermore, the United States Supreme Court has held that "courts should not invalidate ... warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner." *Gates,* 462 U.S. at 236, 103 S.Ct. at 2331, 76 L.Ed.2d at 547 (quoting *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689 (1965)).

■ Finally, we must bear in mind that the probable cause requirement does not deprive law enforcement officers of the use of reasonable, common sense inferences in probable cause determinations. "The point of the Fourth Amendment, ... is not that it denies law enforcement *the support of the usual inferences which reasonable men draw....*" *Seiler,* 342 N.W.2d at 267 (quoting *State v. Hamilton,* 236 N.W.2d 325, 327–28 (Iowa 1975); *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440 (1948)). "[T]he evidence ... collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Gates,* 462 U.S. at 232, 103 S.Ct. at 2329, 76 L.Ed.2d at 544.

With these principles in mind, we turn to the record before us. Officer Stearns' warrant application listed the places to be searched as Green's residence, the attached garage, and a 1983 silver Olds Sierra. The items to be seized were:

> [a]ny and all personal belongings, such as clothing, personal effects, letters containing or leading to her whereabouts. Regarding Rosemary Rita McGivney d.o.b. 07–30–42 SS # 482–50–2177 ht 5'8 wt 160.

As already noted, the warrant application recited that the property sought was (1) used or possessed with the intent to be used as a means of committing a public offense, (2) concealed to prevent an offense from being discovered, or (3) relevant and material as evidence in a criminal prosecution. In the section of the application calling for facts supporting probable cause, Stearns listed his personal knowledge that (1) McGivney's mother reported her as a missing person on August 14, 1993; (2) during a visit to McGivney's last known address (Green's residence), he observed McGivney's car; (3) during the same visit Green refused to allow a search

and became very agitated and upset; and (4) during the time when McGivney and Green lived together, police had responded to a number of domestic abuse calls at their residence. Under the section captioned "facts provided by an informant," Stearns referenced (1) Officer Greg Scott's missing persons report, (2) the report prepared by Lieutenant Ellingson, and (3) the fact that Green had advised Officer Scott that some of McGivney's personal belongings were still at his residence. Under the section "how informant learned of these facts," Scott advised that "Mary Van Hamme (Rosemary's mother) usually heard from Rosemary quite often." Finally, the warrant application and attached exhibits also revealed that McGivney's social security (SSI) checks were being returned to Mary Van Hamme uncashed; Green told police that McGivney had left him to run off with another man; and local mental health centers had no knowledge of McGivney's whereabouts.

■■■ Based on these facts, we believe the magistrate was justified in finding probable cause to issue a search warrant. Several factors suggest that McGivney's disappearance was not voluntary. For example, had McGivney left Mason City of her own accord, it is reasonable to believe she would have needed money and a means of transportation, yet she left her car and SSI checks behind. Given the fact that Rosemary normally kept in touch with her mother on a regular basis, her complete lack of communication for at least three months bolsters the conclusion that her disappearance was not voluntary. Added to this mysterious disappearance is Green's history of domestic violence toward her. *See State v. Vincent*, 229 Conn. 164, 640 A.2d 94, 99 (1994) (court considered defendant's acts of violence against a missing person as one factor in probable cause equation). This knowledge, coupled with the fact that Rosemary was last seen at Green's house, adds support to the conclusion that some harm had come to her and that Green was involved. Finally, Green's extreme reaction to the request to search his house calls into question his explanation of Rosemary's disappearance. Although a refusal to submit to a search may not, standing alone, constitute probable cause to believe an offense has been

committed, *People v. Younger*, 327 Mich. 410, 42 N.W.2d 120, 122 (1950), when added to the other facts in this case, it strengthens the probable cause finding.

Thus we conclude the warrant documents contain a sufficient factual basis from which the magistrate could reasonably have inferred that McGivney's disappearance resulted from criminal activity. A reasonable person could infer that evidence of this activity would be found at Green's residence.

B. *Alleged misrepresentations and omissions in warrant application.* Green claims in the alternative that the search warrant is invalid because it contained false statements and omitted material facts. He argues that if the information in the application had been correct, there would not have been probable cause to support the search.

■■■ To impeach a search warrant, the burden rests on the defendant to show

allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted ... is only that of the affiant, not of any nongovernmental informant.

*Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667, 682 (1978). The remedy for such a Fourth Amendment violation is to excise the false statements from the warrant application. If the remainder of the application fails to establish probable cause, the fruits of the search must be suppressed. *State v. Niehaus*, 452 N.W.2d 184, 186–87 (Iowa 1990).

■■■ Thus Green bears the burden of proving Stearns made deliberately false statements in the warrant application or acted in reckless disregard for the truth. Al-

though the court is "limited to considering the facts presented to the issuing judicial officer in determining whether probable cause existed, ... in determining whether misrepresentation was intentional or material the surrounding facts are relevant and may be considered." *State v. Paterno,* 309 N.W.2d 420, 424 (Iowa 1981) (citations omitted).

■■■■■ (1) *McGivney's car.* The warrant application did not contain Green's statement that he bought Rosemary's car, an explanation for its presence in his garage. Green argues omission of the explanation materially misrepresents the facts. But an officer applying for a search warrant "is not required to present all inculpatory and exculpatory evidence to the magistrate," only that evidence which would support a finding of probable cause. *State v. Johnson,* 312 N.W.2d 144, 146 (Iowa App.1981). Omissions of fact constitute misrepresentations only if the omitted facts "cast doubt on the existence of probable cause." *State v. Ripperger,* 514 N.W.2d 740, 745 (Iowa App.1994) (quoting *United States v. Ellison,* 793 F.2d 942, 948 (8th Cir.1986)).

The recitation of Green's explanation would not have cast doubt on the existence of probable cause. The fact that McGivney's car remained in Green's garage was not even one of the factors relied upon by the magistrate in finding probable cause. Stearns was not required to include every potentially exculpating fact in the warrant application. *See Ripperger,* 514 N.W.2d at 745 (officer's focus on facts that support the warrant not fatal). Moreover, Green has made no showing that the omission was intentional or made with reckless disregard for the truth.

■■■■■ (2) *Number of domestic abuse calls.* Next, Green claims Stearns exaggerated by stating that there had been "a number of" domestic abuse calls to the Green residence while McGivney was living there. The contention is significant, as the magistrate specifically relied upon this factor in finding probable cause. The record, however, does not support the argument. Although Stearns testified he only *assisted* on one call, he also stated that he was *aware* of several others. Green furnished no independent proof that Stearns falsely represented the number of calls.

■■■■ (3) *Neighbors.* Attached to the warrant application was Lieutenant Ellingson's report that "neighbors have not seen McGivney since last winter." Green argues that "[t]here is absolutely nothing to indicate that any of the officers spoke to Green's neighbors as set forth in Lieutenant Ellingson's report." This conclusory allegation, without more, is insufficient to establish misrepresentation. *See Franks,* 438 U.S. at 171, 98 S.Ct. at 2684, 57 L.Ed.2d at 682 (requiring defendant to give specific reasons supporting claim of misrepresentation). No such record has been made here.

■■■■ (4) *Returned SSI checks.* Green claims that, contrary to Ellingson's representation in the warrant application, McGivney's SSI checks were not being returned uncashed. Van Hamme stated in deposition that McGivney received SSI checks and that her mail was being returned to sender. This information regarding the returned SSI checks was corroborated by Officer Scott. Green has failed to meet his burden of showing the statement was deliberately false or made in reckless disregard for the truth.

■■■■ (5) *Frequency of mother's contact with McGivney.* Green's fifth argument, that Stearns misrepresented the frequency of Van Hamme's contact with her daughter, misstates the record. Green's brief affirmatively alleges that Van Hamme did not tell Officer Scott that she spoke to her daughter "often." A review of the record cited in support reveals a more ambiguous statement:

Q. Did you tell Officer Scott that you usually heard from Rosemary quite often?
A. I don't recall that I told him that, although I did tell him I'm pretty sure that I knew—she knew she could call me collect, and she always did.

Officer Stearns testified he was "pretty certain" he spoke with Van Hamme regarding the frequency of her contact with McGivney, and also received the same impression from Officer Scott. Scott confirmed that Van Hamme told him she usually heard from her daughter on a regular basis. We conclude

that the frequency of contact between mother and daughter was not misrepresented in the warrant application.

 (6) *Voluntary disappearance.* Green makes much of Mary Van Hamme's testimony that she did not check the box marked "missing under circumstances indicating that the disappearance was not voluntary" on the missing persons form. The box was evidently checked by Officer Scott, based on his understanding of the circumstances. Although Van Hamme stated it would not be unusual for McGivney to run away, Van Hamme's actions show she clearly considered it out of character for her daughter not to contact her for three months. Likewise, although Stearns testified that he had no reason to believe the disappearance was other than voluntary, Officer Scott believed the facts concerning the disappearance were suspicious. Viewing the record as a whole, we do not believe the checked box deliberately misstated facts, nor was it done with reckless disregard for the truth.

■ (7) *Belief in criminal activity.* As a final point, Green stresses that Stearns' and Scott's post-warrant deposition testimony belies the warrant application's assertion that probable cause existed to believe a crime had been committed, or was being concealed, at Green's residence. In other words, if the officers were uncertain whether a crime had been committed, Green argues, no warrant should have issued. We disagree. The objective facts revealed in the warrant documents could—and did—convince a reasonably prudent person that proof of crime, or the concealment thereof, could be found at the place to be searched. Such proof was, in fact, found there. Given the presumption of validity accorded warrants, and the objective reasonableness of the search conducted here, we reject Green's suggestion that we suppress its fruits because the officers lost the confidence of their instincts under examination by defense counsel.

We have considered all the arguments pressed by Green, whether discussed here or not, and find them to be without merit. Accordingly, we affirm the judgment entered upon Green's conviction for second-degree murder.

**AFFIRMED.**