# IN THE COURT OF APPEALS OF IOWA

No. 22-0162
Filed January 11, 2023

**STATE OF IOWA,**
    Plaintiff-Appellant,

**vs.**

**JESSE JON HARBACH,**
    Defendant-Appellee.
_____

Appeal from the Iowa District Court for Delaware County, Monica Ackley, Judge.

On discretionary review, the State challenges the district court ruling granting the defendant's motion to suppress. **REVERSED AND REMANDED.**

Brenna Bird, Attorney General, and Israel Kodiaga, Assistant Attorney General, for appellant State.

Martha J. Lucey, State Appellate Defender, and Maria Ruhtenberg, Assistant Appellate Defender, for appellee.

Considered by Bower, C.J., and Greer and Badding, JJ.

**GREER, Judge.**

After the district court granted Jesse Harbach's motion to suppress evidence seized pursuant to a warrant, the State applied for and was granted discretionary review of the ruling.[1]  The State argues the district court misapplied case law in suppressing the evidence based on its determination the warrant application contained false statements that were made knowingly and intentionally or with reckless disregard for the truth and, without the statement, the application failed to establish probable cause.  *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978).  Because there was probable cause to believe Harbach was impaired even without the deputy's false statements, we reverse the district court's suppression ruling and remand.

**I. Background Facts and Proceedings.**

On May 21, 2021, at approximately 5:30 p.m., Harbach was driving a truck when he was involved in a single vehicle rollover accident.  Deputy Sheriff Mitchel Knipper was sent to the scene, where he interacted with Harbach while Harbach received medical treatment.  Based on that interaction, Deputy Knipper applied for a warrant to obtain "[a] blood, urine, and/or breath specimen from" Harbach, claiming he had probable cause to believe Harbach was driving while intoxicated (OWI) at the time of the accident.  *See* Iowa Code § 321J.2 (2021).[2]  The deputy included the following in the warrant application:

---

[1] Our supreme court granted the application before transferring the case to us.
[2] Pursuant to section 321J.2(1), a person commits OWI when they operate a motor vehicle under any of the following conditions:

        a. While under the influence of an alcoholic beverage or other drug or a combination of such substances.

        b. While having an alcohol concentration of .08 or more.

The following observations and conclusions for a traffic violation were made by these officers at the scene: Defendant was involved in a single vehicle accident on 230th Ave/ 250th St. There were skid marks from the defendant's vehicle approaching the intersection, and skid marks around the corner of the intersection. The vehicle then entered the ditch and rolled at least one time, landing on it's top.

Officers know Suspect was operating the motor vehicle because:

The defendant had injuries consistent with being involved in a motor vehicle accident. The defendant admitted to being the only one in the vehicle at the time of the accident. The defendant stated he thought the vehicle may have rolled on top of him during the accident.

Under attachment A-2, titled "observations of impairment," Deputy Knipper marked next to "bloodshot eyes," "watery eyes," "slurred speech," "mumbling speech," and "smell of alcoholic beverage coming from suspect's person." Additionally, Deputy Knipper included the following:

Standardized Field Sobriety Tests (Please indicate score, refusal, or inability)

| Test | Score / Refusal / Inability |
|---|---|
| Horizontal gaze nystagmus | REFUSED |
| Walk and Turn | INABILITY |
| One leg stand | INABILITY |
| Preliminary breath test results | REFUSED |
| Admission to drinking | |
| Other: Suspect refused to answer any questions. | |

A judge granted Deputy Knipper's application, and a blood sample was taken from Harbach. According to the criminal complaint later filed by Deputy Knipper, a blood specimen taken from Harbach was tested by the laboratory at the Iowa Division of Criminal Investigation (DCI) and was determined to contain 634 ng/mil of methamphetamine. Harbach was charged with OWI, first offense.

Harbach filed a motion to suppress, arguing the lab results of his blood specimen indicated "no alcohol was detected" so Deputy Knipper's warrant request "contained a false allegation that the [d]eputy smelled alcohol." Harbach asserted

---

c. While any amount of a controlled substance is present in the person, as measured in the person's blood or urine.

"the warrant was ill-gotten" and "there was no probable cause to support either warrant or the search." The State resisted, claiming the medical records from the first hospital to which Harbach was taken—before he was airlifted to a second hospital for greater levels of care and where the blood specimen was ultimately taken—"show that [Harbach] had an ethanol level of 42 (.042) on May 21, 2021 at 6:30 p.m." The State denied that Deputy Knipper made false statements in his affidavit for the warrant application and asserted that Harbach was unable to meet the burden of the *Franks* test.

The court heard Harbach's motion in January 2022. Deputy Knipper testified that when he arrived at the scene of the accident, emergency services were already rendering aid to Harbach. The deputy spoke with Harbach, who confirmed he had been alone in the vehicle and was the driver; Harbach mentioned an issue with the vehicle's brakes. Harbach believed his truck had rolled on top of him. Later, when Harbach was in the back of the ambulance, Deputy Knipper spoke to him again and asked if he had been drinking; Harbach "was not very forthcoming with many answers." After Harbach was sent to the local medical center, Deputy Knipper drove to the sheriff's office, where he filled out the warrant application before going to a judge's home to have it considered. Once the judge issued the warrant, Deputy Knipper called the local medical center to inform them to do a blood draw. The blood draw was not completed there because, according to Deputy Knipper, "there was a concern that there may be further injuries [to Harbach] because [he] was fighting with medical staff trying to get the blood." After Harbach was airlifted to a different hospital, Deputy Knipper obtained a second warrant and the blood draw was completed—a few hours after the accident took

place. DCI tested the blood and reported there was no alcohol in Harbach's system.[3] At the hearing, the State introduced into evidence a record from the local medical center, where Harbach's blood was apparently drawn for diagnostic purposes (though a specimen was not taken to be sent to DCI); the report included the following:



No witness offered testimony about the meaning of "42" on the medical chart and whether it related to a blood alcohol concentration (BAC) or even the ingestion of alcohol.[4]

The State also introduced into evidence an approximately twelve-minute video of the footage from Deputy Knipper's body camera while he was on the scene of the accident. It showed that when the deputy arrived, Harbach was already strapped to a backboard and wearing a neck brace; medical personnel were actively providing him medical treatment. One of the medical personnel told the deputy: "Apparently it was an Amish buggy and he dodged to miss the Amish buggy." After stating he had not lost consciousness, Harbach added, "My brakes are shot. I went to hit the brakes and they went to the floor." Deputy Knipper was told Harbach believed he was ejected from the vehicle and that he was on the

---

[3] Deputy Knipper testified to this; no report from the DCI lab was admitted into evidence.

[4] At the suppression hearing, Deputy Knipper was asked questions about the number; he initially suggested the number translated to .042 BAC but, upon further questioning, admitted he did not have an understanding of blood serum analysis, did not know how that number came to be calculated, and did not know what a serum toxicology ethanol level was.

ground beside the road when the first witness arrived. Some witnesses who had been working nearby approached Deputy Knipper and reported hearing squealing and then, when they "came out, it was tipped over and there was an Amish buggy, it was parked on the corner there, going up the hill." The witnesses reported the buggy had left the scene and they wanted to make sure officers were aware one was present. Another officer arrived and posed a question to Deputy Knipper, to which he responded, "I don't know. All I can smell over there is gasoline" and he would "hop in with [Harbach] in a little bit or talk to him up there." A third officer approached and asked Deputy Knipper if he smelled Harbach; the deputy responded, "Right where he's at now it's just gasoline, but I'm going to guess it's 55."[5]

After Harbach was moved to the back of the ambulance, Deputy Knipper entered and began asking Harbach questions; when the deputy asked where he was coming from, Harbach—who was still receiving medical treatment while he remained on a backboard with the neck brace on—responded, "I can't talk right now. It hurts." Deputy Knipper asked another question and remained in the back of the ambulance for about another minute—until one of the medical personnel asked him to move, telling him he was in the way. The deputy left the back of the ambulance for about thirty seconds and then re-entered, again asking Harbach, "Where were you heading to? Or where were you coming from, do you know?"

---

[5] "10-55" is an intoxicated drunk driver. *See State v. Kooima*, No. 11-0738, 2012 WL 1026056, at *5 (Iowa Ct. App. Mar. 28, 2012), *vacated by State v. Kooima*, 833 N.W.2d 202 (Iowa 2013); *see also The APCO Project—A National Training Manual and Procedural Guide for Police and Public Safety Radio Communications Personnel*, at 60 (Feb. 1968), *available at* https://archive.org/details/national training025505mbp/page/n59/mode/2up (last visited Dec. 15, 2022).

among other questions. Harbach did not verbally respond and then asked someone else to intercede, stating, "Hey. Leave me alone; I can't talk. Hey. Hey. Tell this guy to quit questioning me; it hurts." Deputy Knipper remained and asked Harbach, "Alright, yes or no, did you have anything to drink today? I'll ask short questions." When Harbach did not immediately respond, Deputy Knipper followed up with, "No? Don't want to answer?" Harbach said, "No," and Deputy Knipper responded, "Okay," and then exited the ambulance again.[6]

The district court granted Harbach's motion to suppress, ruling:

> The application for the warrant indicated the reasons for the warrant were based on the appearance of [Harbach]. The Deputy contends [Harbach] had bloodshot and watery eyes, his speech was slurred and mumbled and there was a smell of alcoholic beverage coming from [his] person. The application indicates [Harbach] refused to answer questions. The deputy failed to tell the magistrate that the reason for the refusal related to the fact he was in pain and injured as he laid on a stretcher with a neck collar strapped to his head. No mention was made in the application about the Manchester hospital blood draw showing an ethanol level of .42.[ The record does not show a BAC. The deputy testified he did not know if the ethanol level is the same as a BAC.]
>
> The Court finds that the deputy made an assumption as to the reason for the accident. When he found out who the driver was, the deputy's attitude adjusted to conclude [Harbach] was drinking. The Court's observation of the body cam video does not show a person with bloodshot or watery eyes. [Harbach's] speech was not slurred. At times he was muttering due to the pain but other times he was forceful in asking that someone have the questioning stop due to the pain. The deputy stated he smelled gasoline in the outdoor space surrounding the location of [Harbach]. The deputy was inside the ambulance for a very short period of time. Due to the fact the EMTs were attempting to render aid and use appropriate equipment, the deputy was asked to exit, as he was in the way of their efforts. He left the ambulance. But, before it left the scene, he entered one final time. Again, it was a very short period of time. It is unclear what he could smell in the ambulance given all the medical supplies contained inside and the equipment being used on [Harbach].

---

[6] We do not have a transcript of the video; the quotations included are our best attempt at transcribing from our review of the exhibit.

. . . .

. . . The motion to suppress shows that the blood drawn from [Harbach] by the hospital and analyzed by the DCI Lab detected no alcohol in [his] system. It begs the question then, how could one smell what is not present?

[Harbach] has established by a preponderance of the evidence that the warrant contained false statements. The offensive statements extracted from the application leaves the remaining contents lacking in probable cause. Just because a traffic accident occurs does not automatically mean alcohol was involved. It does not mean that [Harbach] was drinking as assumed by the deputy. The deputy had bystanders telling him that they heard tires squealing and saw the Amish buggy. That in and of itself is not probable cause for a blood sample. There was no indicia of drinking about the person of [Harbach].

The State appeals.

## II. Standard of Review.

"Our review of challenges to a ruling on the merits of a motion to suppress is de novo [where, as here,] such claims implicate constitutional issues." *State v. Baker*, 925 N.W.2d 602, 609 (Iowa 2019).

## III. Discussion.

In *Franks*, 438 U.S. at 155–56, "the Supreme Court developed a means to examine truthfulness of an affiant in presenting evidence to a magistrate supporting issuance of a search warrant." *State v. Niehaus*, 452 N.W.2d 184, 186 (Iowa 1990). The Court held:

[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant

must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks*, 438 U.S. at 155–56. And shortly after, our supreme court adopted the *Franks* standard for considering veracity claims under the Iowa Constitution. *See State v. Groff*, 323 N.W.2d 204, 207 (Iowa 1982).

Here, Harbach was not forced to make a preliminary showing of falsehood to obtain an evidentiary hearing. *See id.* at 209 (*"To mandate an evidentiary hearing the challenger's [preliminary showing] must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.*" (alteration in original) (quoting *Franks*, 438 U.S. at 171)). But, as the State seems to recognize, it cannot now complain the procedure was inadequate because "the State failed to object in the district court." *Id.* So, we proceed to consider the merits of Harbach's veracity claim. *See id.*

To meet his burden, Harbach must "prov[e] that officers made materially false statements in the affidavit either deliberately or with a reckless disregard for the truth." *Baker*, 925 N.W.2d at 614. "An officer applying for a search warrant 'is not required to present all inculpatory and exculpatory evidence to the magistrate.'" *State v. Green*, 540 N.W.2d 649, 657 (Iowa 1995) (citation omitted). But an omission of facts can constitute a misrepresentation that results in suppression. *See State v. Ripperger*, 514 N.W.2d 740, 745 (Iowa Ct. App. 1994) ("The omission of facts rises to the level of misrepresentation only if the omitted facts 'cast doubt on the existence of probable cause.'" (quoting *United States v. Eillson*, 793 F.2d

942, 947 (8th Cir. 1986))). In deciding the veracity question, we are not limited to the four corners of the warrant application: "[T]he court is 'limited to considering the facts presented to the issuing judicial officer in determining whether probable cause existed, [but] in determining whether misrepresentation was intentional or material the surrounding facts are relevant and may be considered.'" *Green*, 540 N.W.2d at 657 (citation omitted).

First the district court took issue with how Deputy Knipper marked the following as observations of impairment:

X     Bloodshot eyes
X     Watery eyes
X     Slurred speech
X     Mumbling speech
X     Smell of alcoholic beverage coming from Suspect's person

We start with the "[s]mell of alcoholic beverage coming from Suspect's person" because, in his motion to suppress and at the hearing, Harbach's only allegation was that the deputy falsely claimed he "smelled alcohol, when the test results ultimately showed that there was no alcohol in the blood." The district court likewise characterized the deputy's statement about smelling alcohol as false. Yet, on this basis, Harbach failed to meet his burden under *Franks*; we disagree with the court's conclusion that no alcohol being found in Harbach's blood draw means Deputy Knipper lied about smelling alcohol coming from Harbach. Approximately three hours elapsed between Deputy Knipper's interactions with Harbach and the blood draw that DCI tested;[7] it is possible that alcohol was present in Harbach's person at the time Deputy Knipper spoke with him that was not detectable three

---

[7] We have no report from DCI or the hospital that completed the blood draw. This time frame is taken from Deputy Knipper's testimony at the suppression hearing.

hours later. *See State v. Johnson*, 744 N.W.2d 340, 343 n.1 (Iowa 2008) (recognizing "blood alcohol level naturally dissipates during a delay . . . as the alcohol dissipates from the human body"). Also, the district court questioned the deputy's ability to smell alcohol coming from Harbach while in the back of the ambulance due to "the medical supplies contained inside [the ambulance] and the equipment being used on" Harbach. But we cannot rule out the possibility that the use of those medical supplies on Harbach was a source of some alcohol smell. In which case, Deputy Knipper may have been mistaken about smelling alcoholic beverage coming from Harbach's person, but a mistake of fact is not the same thing as an intentional falsehood. *See State v. McPhillips*, 580 N.W.2d 748, 751 (Iowa 1998) ("To successfully impeach the warrant application . . . [t]he officer's conduct must be more than negligence or a mistake."); *cf. State v. Louwrens*, 792 N.W.2d 649, 652 (Iowa 2010) (recognizing case law that holds an officer's "reasonable mistake of fact" will not undo probable cause for a traffic stop). We cannot conclude Deputy Knipper was intentionally dishonest or misleading when he claimed to smell alcoholic beverage coming from Harbach's person. And our inability to say one way or the other means Harbach did not carry his burden to establish Deputy Knipper made materially false statements either deliberately or with a reckless disregard for the truth when he claimed to smell an alcoholic beverage coming from Harbach's person. So we do not "delete" this claim from the warrant application. *See Groff*, 323 N.W.2d at 206.

In reaching this conclusion, we give no weight to the report from the local medical center that Harbach had an "ethanol level" of "42" because the record is devoid of any explanation of the medical or scientific significance of that

information and we will not assume that "42" automatically translates into .042 BAC. The district court relied heavily on the DCI test results of the blood drawn at the second hospital, which showed a lack of alcohol in Harbach's system. Even so, we note Harbach had the burden of proof in this *Franks* inquiry. Although Deputy Knipper assumed, whether because of a mistake in interpreting the report or otherwise, that there would be some ethanol level supporting his claim he smelled alcohol, Harbach offered no expert testimony distinguishing the report from the local medical center that referenced an ethanol level with the DCI results that showed none. Thus, the district court's sole reliance on the one report does not prove a deliberate falsehood or reckless statement by Deputy Knipper over his observations concerning the alcohol consumption without some explanation of the other results.

We next consider the other observations of impairment noted by Deputy Knipper: bloodshot eyes, watery eyes, slurred speech, and mumbling speech. The district court found the following: "[T]he body cam video does not show a person with bloodshot or watery eyes. [Harbach's] speech was not slurred. At times he was muttering due to the pain but other times he was forceful in asking that someone have the questioning stop due to the pain." There is no close up of Harbach's eyes on the video; at one point his eye is watering and yet, from the quality of the video, it is difficult to conclude one way or the other whether Harbach's eyes were bloodshot and watery. Still, at the suppression hearing, Harbach did not raise these specific observations as falsehoods or reckless statements by Deputy Knipper but instead argued that any bloodshot eyes or speech issues were more likely caused by the rollover accident. So, at best, there

was a difference of opinion from the court, Harbach, and Deputy Knipper as to what caused these observations of impairment. This hardly qualifies as a falsehood or reckless statement from Deputy Knipper. True, some details of the accident and Harbach's condition were not detailed in the warrant application. But we conclude these details do not rise to the level of a misrepresentation of fact that casts doubt on the existence of probable cause, *see Ripperger*, 514 N.W.2d at 745, as the issuing court was informed that Harbach was involved in a rollover single vehicle accident—with the vehicle "landing on its top"—and that Harbach was unable to do the "walk and turn" and "one leg stand" tests. While there may have been other reasons for Harbach's condition, those noted were legitimate observations supporting probable cause for the warrant even with injuries from an accident. *See McPhillips*, 580 N.W.2d at 750–51 (noting that to succeed in a *Franks* claim, the defendant must show the officer purposely untruthful over a material fact in the warrant application or acted with reckless disregard for the truth such that the magistrate was misled into believing certain facts used to evaluate probable cause).

Finally, Deputy Knipper wrote "suspect refused to answer questions," which the district court saw as misleading. In stating Harbach refused to answer any questions, Deputy Knipper omitted the context—that Harbach was strapped to a backboard, wearing a neck brace, and actively receiving medical treatment in the back of an ambulance when he told the officer he couldn't talk because "it hurts." And while the deputy's note is not completely accurate, when pressed on questions related to intoxication, Harbach refused to answer those questions in spite of the

fact he willingly volunteered information not related to a criminal investigation. Thus, the statement was not completely untrue.

Yet, on our de novo review, we can conclude the deputy did make an intentionally false or misleading comment in the application for a warrant. *See State v. Niehaus*, 452 N.W.2d 184, 188 (Iowa 1990) ("[O]ne focus of a *Franks* inquiry is on whether the affiant consciously presented false or misleading information to the issuing magistrate, or acted recklessly in presenting the factual information in such a way that it could mislead the magistrate."). In spite of his claim Harbach declined the horizontal gaze nystagmus and preliminary breath test, the video shows the deputy never asked Harbach to complete them.[8] Whether he intentionally provided this inaccurate information or was reckless in presenting it, these are false statements. *See Groff*, 323 N.W.2d at 210 ("A 'false' affidavit statement is one which misleads the magistrate into believing the existence of certain facts which enter into his [or her] thought process in evaluating probable cause."); *see also State v. Seager*, 341 N.W.2d 420, 425 (Iowa 1983) ("[U]nder [*Franks*], intentionally false statements and false statements made with a reckless disregard for the truth are treated the same.").

We must now "delete" the statements we have found intentionally false and those made with reckless disregard for the truth and then scrutinize "the remaining

---

[8] The video begins before Deputy Knipper arrived on scene, while he is still driving, and ends about twelve minutes later, with Deputy Knipper exiting the ambulance, telling another officer he will "be at the office" and then walking toward a squad car. From this and Deputy Knipper's affirmative answer to the question if his body camera was "activated during the time that [he] was on the scene of the accident and in [his] conversations with Mr. Harbach," we infer the video shows the entirety of Deputy Knipper's interaction with Harbach.

contents . . .to determine whether probable cause appears. *See Groff*, 323 N.W.2d at 206. Based on our foregoing analysis, we do not consider Deputy Knipper's claims that Harbach refused the horizontal gaze nystagmus and the preliminary breath test. That leaves the deputy's narrative that a single, rollover accident occurred while Harbach was driving and that the officer smelled alcoholic beverage coming from Harbach's person and observed that Harbach had bloodshot, watery eyes and slurred, mumbling speech.

As the district court put it, "Just because a traffic accident occurs does not automatically mean alcohol was involved." And the smell of alcohol alone—without any other indicia of impairment—is certainly a weakness to consider when evaluating probable cause of impairment. *Cf. State v. Lovig*, 675 N.W.2d 557, 565 (Iowa 2004) (affirming officers had probable cause to arrest for OWI when the driver of a single-vehicle rollover left the scene of the accident before police arrived, when one witness smelled alcohol on her breath and beer bottles were found in and near the vehicle); *State v. Wilkes*, 758 N.W.2d 838, 845 (Iowa 2008) (finding probable cause to invoke implied consent when the officer smelled "the strong odor of alcohol on [the defendant's] breath, obtained a concession that he had been drinking, and performed the horizontal gaze nystagmus test"). But here, we conclude Deputy Knipper presented the necessary evidence to the issuing court to support probable cause for the warrant. While adding more detail to the warrant might have suggested other reasons for Harbach's impairment, certainly those facts presented by Deputy Knipper offered a common sense conclusion that a warrant was necessary. *Baker*, 925 N.W.2d at 613–14 (reviewing warrant applications under a common sense approach). "We draw all reasonable

inferences to support the judge's finding of probable cause and decide close cases in favor of upholding the validity of the warrant." *Id.* at 614. So, we look to the totality of the circumstances and find the judge had a substantial basis for concluding probable cause existed even after we reject Deputy Knipper's notations about the testing. *See id.*

In conclusion, we find a *Franks* violation occurred as to part of the warrant application, but after setting "the affidavit's false material set to one side," we conclude "the affidavit's remaining content" establishes probable cause to support the issuance of the warrant. *See* 438 U.S. at 155–56. Therefore, we reverse the district court's suppression ruling related to the evidence obtained from the blood draw and subsequent testing.

**REVERSED AND REMANDED.**