STATE of Iowa, Appellee,

v.

Ralph Phillip CARLSON, Appellant.

No. 94–1873.

Supreme Court of Iowa.

April 17, 1996.

Rehearing Denied May 15, 1996.

Linda Del Gallo, State Appellate Defender, and Ahmet S. Gonlubol, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Mary Tabor, Assistant Attorney General, John P. Sarcone, County Attorney, and Steven Foritano and Jeffrey Noble, Assistant County Attorneys, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, CARTER, and TERNUS, JJ.

HARRIS, Justice.

On the basis of a missing person report, officers seized evidence during a nighttime warrantless search of defendant's residence following a forced entry. The question, whether the search was valid, turns on whether a "health and safety" search is authorized under certain extreme circumstances. We think it is authorized, and believe the facts here present the perfect model for its correct application. We accordingly affirm defendant's murder conviction.

In the early morning hours of January 27, 1994, police received a missing person report from Rhonda Young. She was concerned about her mother, Rita Young, who had been living with defendant Ralph Carlson. Two police officers, Cynthia Walters and Steven Kees, responded by meeting with Rhonda at an apartment where she was visiting a friend. Rhonda told the officers she usually spoke with Rita twice a day, but had not heard from her since the 25th. She was extremely worried because Carlson had previously been abusive to Rita.

Rhonda also provided the officers with additional, unsettling information. Carlson had offered conflicting stories about Rita's whereabouts. He telephoned Rita's sister, Glenda Jones, on the evening of January 25 and put Rita on the line. After the two sisters engaged in a brief, awkward conversation, the line was cut off. A few minutes later Carlson called back and said Rita was drunk and he was taking her to her friend Jim's apartment. Glenda heard strange noises in the background and asked to speak with Rita, but Carlson replied she was in the bathroom. Glenda became concerned and tried without success to call Rita at Jim's.[1] Glenda then phoned Carlson, who told her he dropped Rita off approximately a block and a half from Jim's, and Rita had called him back from a private number and said she was leaving to visit her parents in Missouri.

Not satisfied, Glenda asked her husband, Roger Jones, to call Stacy Young, Rhonda's sister, about Rita's welfare. When told of the odd conversation with Carlson, Stacy related the story to Rhonda. This prompted Rhonda to begin her own inquiry, and she phoned Carlson. This time Carlson replied that Rita had "walked out the front door," and he had not seen her since.

As Rhonda's worries increased she devised a covert plan to check on her mother. On the evening of January 26, as a ruse to enter Carlson's house to check for indications of her mother's whereabouts, Rhonda phoned Carlson and asked if she could borrow a certain special dish.[2] Although Rhonda lived only a few blocks away, when she arrived Carlson was nowhere to be found. The lights in the house were on, the garage door was up, and Carlson's car was gone—indicating he had left hurriedly.

Rhonda related all the foregoing to the officers and, based on this information, they went to Carlson's residence to check on Rita. When they arrived there they saw a person watching television in an upstairs room. The officers knocked on the various doors of the house repeatedly and also had the police dispatcher telephone the residence numerous

1. Apparently unbeknownst to Carlson, Rita rented an apartment upstairs from Jim. The apartment had no telephone so family members reached Rita by leaving messages with Jim. Rita kept this matter from Carlson because, when she attempted to establish her own residence on a prior occasion, Carlson became upset and ransacked the apartment.

2. There was conflicting testimony concerning whether Rhonda had related Carlson's conflicting statements and the dish ruse to the officers at this point in time. Both Rhonda's and Officer Kees' testimony indicated she had, but Officer Walters' testimony indicated she had not. Under our de novo review (see division I) we find Rhonda had related this information to the officers before they left for Carlson's residence.

times, but there was no response. At this point the officers asked Sergeant David Brown, their supervisor, to come to the scene for a consultation on how to proceed further.

Sergeant Brown was familiar with the residence, having responded to a domestic abuse report there two months earlier where he confiscated a weapon. He also knocked on the door and had the dispatcher again phone the residence, but there was still no response. He then decided to summon Rhonda to the scene so he could hear from her firsthand before taking any further action. Brown also advised his supervisors of the situation, and Lieutenant Larry Cramer replied he would be on the scene shortly to assist.

Rhonda soon arrived with her boyfriend and repeated all the information she had provided to Officers Kees and Walters. She stressed the history of domestic abuse and Carlson's nervous and evasive answers to questions regarding Rita's whereabouts. Rita's boyfriend, who had independently looked into the matter, was convinced Carlson was at home. There were fresh tire tracks in the newly fallen snow, and Carlson's car was in the garage. Rhonda noticed Carlson's dog was inside the house, which she thought was peculiar because the dog normally was kept in the basement or outside. She pointed out that Carlson usually answered the phone on the second ring, and she thought his failure to answer was another indication that something was amiss.

Rhonda told the officers that the residence was a duplex, and the person they had observed in the upstairs room was a tenant. Rhonda and Officer Walters knocked on the tenant's door and spoke briefly with him. The tenant reported he had not seen Rita and stated that, if Carlson's car was in the driveway, he was probably asleep in his own apartment.

With aroused concern, the officers gathered by the back door and decided to make a forced entry. They broke out a window in the door and entered Carlson's residence where they found him asleep in bed. Carlson told the officers he did not know where Rita was. Police then continued on a cursory search of the house and in the basement

found Rita's bound and beaten body behind the furnace. The officers handcuffed Carlson and took him to headquarters for questioning. A search warrant was obtained before the police conducted a more thorough search of the house.

After Carlson was charged with murder, he moved to suppress the results of the warrantless search of his residence. The district court upheld the search. The matter is before us on Carlson's appeal from his subsequent conviction.

■ I. Carlson makes a constitutional claim, so our review is de novo. Iowa R.App.P. 4. We examine Carlson's claim by making an independent evaluation of the totality of the circumstances as shown by the entire record. *State v. Vincik,* 436 N.W.2d 350, 353 (Iowa 1989).

II. Carlson contends the district court erred by denying the motion to suppress the evidence seized from his residence as a result of the warrantless forced entry of the premises based on a missing-persons report. Both the fourth amendment of the United States Constitution and article I, section 8, of the Iowa Constitution protect citizens against "unreasonable searches and seizures." The purpose of this protection is to safeguard the privacy and security of individuals against arbitrary invasion by government officials. *Michigan v. Tyler,* 436 U.S. 499, 504, 98 S.Ct. 1942, 1947, 56 L.Ed.2d 486, 495 (1978). It is well settled that, subject to a few carefully drawn exceptions, warrantless searches are per se unreasonable. *State v. Emerson,* 375 N.W.2d 256, 258 (Iowa 1985). Evidence obtained by an illegal search is inadmissible unless the state proves by a preponderance of the evidence that a recognized exception to the warrant requirement applies. *See Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971); Iowa R.Crim.P. 11.

■ In *Emerson,* on the basis of the emergency-aid exception, we recognized a police officer's right to enter a dwelling without a warrant for the purpose of rendering emergency aid and assistance. 375 N.W.2d at 258–59; *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290, 300

(1978) (recognizing the right of police to respond to emergency situations by making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid). In doing so we acknowledged the myriad of tasks performed by peace officers. *Emerson*, 375 N.W.2d at 258. As one commentator explains:

> The police have complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses; by design or default, the police are also expected to reduce the opportunities for the commission of some crimes through preventative patrol and other measures, aid individuals who are in danger of physical harm, assist those who cannot care for themselves, resolve conflict, create and maintain a feeling of security in the community, and provide other services on an emergency basis.

3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 6.6, at 390 (3d ed. 1996) (quotations omitted) (citing ABA Standards for Criminal Justice §§ 1–1.1, 1–2.2 (2d ed. 1980)). In essence police officers function in one of two roles: (1) apprehension of criminals (investigative function); and (2) protecting the public and rescuing those in distress (caretaking function). *See Emerson*, 375 N.W.2d at 258.[3] Courts have noted that preservation of human life is paramount to the right of privacy protected by the fourth amendment. *State v. Boggess*, 115 Wis.2d 443, 340 N.W.2d 516, 521 (1983). Thus the emergency-aid exception is justified because the motivation for the intrusion is to preserve life rather than to search for evidence to be used in a criminal investigation. *Duquette v. Godbout*, 471 A.2d 1359, 1362 (R.I.1984). The exception has been applied in a variety of factual situations, including entry of a dwelling to seek an occupant reported as missing. *See* LaFave § 6.6(a), at 396 (and cases there cited).

The emergency-aid exception is subject to strict limitations. In *Emerson* we adopted a two-step analysis to determine the reasonableness of a warrantless search under the emergency aid exception:

> First, the search is invalid unless the searching officer is actually motivated by a perceived need to render aid or assistance. Second, even though the requisite motivation is found to exist, until it can be found that a reasonable person under the circumstances would have thought an emergency . . . existed, the search is invalid.

375 N.W.2d at 259. We said both the subjective and objective tests must be met for the search to be valid. *Id.*

Our court has adopted purely objective tests in two recent criminal-procedure cases. *See State v. Huisman*, 544 N.W.2d 433 (Iowa 1996) (decision to impound vehicles); *State v. Hofmann*, 537 N.W.2d 767, 769–70 (Iowa 1995) (pretextual arrest). In view of these recent holdings we must review whether the two-step analysis, applying both subjective and objective tests, continues to be appropriate.

Although it would clearly not change the outcome of this appeal (because the subjective test would be readily satisfied), we think the subjective part of the analysis should now be abandoned when applying the emergency-aid doctrine. For one thing, the officers' subjective thinking processes are not satisfactorily susceptible of proof or disproof. For another thing, the officers' subjective thinking processes shed little light on the reasonableness of the intrusion. As a matter of simple fairness, reasonableness should be

---

**3.** Though the emergency-aid exception is one of many community caretaking functions of the police, it must be assessed separately and by a distinct test, as all such functions are not judged by the same standard. *See* LaFave § 6.6, at 390. The community caretaking function was first recognized in *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). As *Cady* emphasized the distinction between motor vehicles and dwelling places, it has commonly been interpreted as limiting the community caretaking function exception to vehicles. Some courts have however recognized that circumstances similar to those in *Cady* can sometimes provide sufficient grounds for a warrantless search of a dwelling. LaFave § 6.6, at 390.

The emergency-aid exception must also be distinguished from the exigent-circumstances exception, because the emergency-aid exception is invoked only when police are not involved in crime-investigatory activities. *People v. Davis*, 442 Mich. 1, 497 N.W.2d 910, 920 (1993). The exceptions are therefore based on related yet distinct rationales.

tested, as our cited recent cases indicate, only on the basis of the objective circumstances.

■ III. The next question is whether the objective test is to be satisfied in accordance with the traditional probable-cause requirements that have been applied to criminal searches. We have already noted that the emergency-aid doctrine is a distinct one, different from the more common exception to the warrant requirement that applies when probable cause is coupled with exigent circumstances. In view of the distinction, courts have applied a less stringent probable-cause test in objective test cases than would be required for exigent-circumstance cases. *See, e.g., Duquette,* 471 A.2d at 1362. The rationale may be explained this way:

> The defendant ... argues ... that we should adopt a standard of "no less than probable cause" to govern use of the emergency doctrine in this state. It is significant to remember that the emergency exception does not arise from a police function of criminal investigation, but from the community caretaking function. "[P]robable cause is the sine qua non of criminal searches...." "Probable cause, broadly defined, comprises such facts 'as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe' that criminal

activity has occurred." We see no reason to require the standard for criminal investigatory searches to govern an emergency doctrine exception that derives, not from the investigatory function, but from the function designed to save human life.

*State v. Blades,* 225 Conn. 609, 626 A.2d 273, 280 (1993) (citations omitted). Thus, an objective determination of reasonableness, as opposed to a formal inquiry regarding probable cause, is a sufficient protection of individual privacy under the circumstances contemplated by the exception.[4] To establish "reasonableness," the police have the burden of showing specific and articulable facts that indicate their actions were proper. In addition, the scope of the entry and search "must be limited to the justification thereof, and the officer may not do more than is reasonably necessary to determine whether a person is in need of assistance, and to provide that assistance." *Davis,* 497 N.W.2d at 921.

■ We thus proceed to test Carlson's challenge in accordance with the objective test. We think the test is easily satisfied. Certainly the officers acted reasonably in responding to the missing-person report. Rhonda Young was visibly upset because her mother, in stark variance with her established pattern, had not called her for two days. Carlson's past history of domestic vio-

---

4. Lowering the probable-cause standard, even for the limited purpose of this exception, might seem at odds with a superficial reading of our opinion in *State v. Green,* 540 N.W.2d 649 (Iowa 1995). In *Green* we found the district court erred in upholding the warrant within the parameters of a noncriminal search warrant issued under Iowa Code § 808.14 (administrative warrant by judicial branch agencies) because our missing-person statute, Iowa Code chapter 694, grants the police no authority to conduct "inspections." We thus concluded that, without statutory authority to conduct inspections for missing persons, no basis for the issue of an administrative warrant under § 808.14 existed. We did however uphold the validity of the search, holding the magistrate was justified in finding probable cause to issue a criminal search warrant.

One might argue that *Green* contradicts any suggestion that objective test cases involve a less stringent standard than probable-cause causes. For example, how can it be said on the one hand that an administrative warrant may not be issued under a standard lesser than probable cause to

search for missing persons, but on the other hand that police may validly act on the same basis under the emergency-aid exception?

*Green* however does not control our analysis in the present case for two reasons. First, and most obviously, in *Green* we did not consider whether either the exigent circumstances or the emergency-aid exceptions applied to the facts of the case. Second, *Green* is factually distinguishable in that the victim had been missing more than *five months* and the defendant refused the officers' request for permission to search his residence. This distinction underscores the temporal element inherent in the emergency-aid exception, *see Duquette,* 471 A.2d at 1363 (police must have an objective, reasonable belief that a crisis can only be avoided by swift and immediate action); *State v. Beede,* 119 N.H. 620, 406 A.2d 125, 131 (1979) (although exigencies may suddenly arise with the passage of time, and they may also disappear with the passage of time), as well as the issue of consent (*i.e.,* if Carlson had simply answered the door and refused the officer's request to search the residence, this would be an entirely different case).

lence significantly heightened Rhonda's concerns for her mother's welfare. Rita had secretly been attempting to establish her own residence, and women are at greater risk of injury or death when they are attempting to end an abusive relationship. *See* Final Report of the Iowa Supreme Court Task Force on Courts' and Communities' Response to Domestic Abuse Act 10–11 (1994). When the officers attempted to call Carlson at his residence, they observed additional unusual circumstances. Tire tracks were visible in the fresh snow and Carlson's car was in the garage, yet there was no response to repeated knocking and phone calls. In addition Carlson's dog was ordinarily outside or shut in the basement, but on the night in question the dog was seen roaming the main floor of the house. Carlson's contradictory statements regarding Rita's whereabouts and Rhonda's recount of the dish ruse further elevated the concern.

In applying the objective test we consider all the foregoing matters that were known by the officers. We must also keep in mind that one crucially important thing was not then known. Although it seemed highly likely that some terrible harm may have befallen her, requiring a rescue, the officers did not know that Rita was dead; they were searching for Rita, not her body.

Under these circumstances a reasonable person would have thought an emergency existed. Hence we find the police provided sufficient evidence to establish the objective test and we hold the search was valid under the emergency-aid exception to the warrant requirement.[5] To do so is no threat to a citizen's fundamental right to be protected against unreasonable searches and seizures. Precious as that right is, the officers were correct in recognizing that it must yield to a citizen's right to be rescued from death or terrible harm. Although the officers here arrived too late to rescue Rita, they were unaware of her death when they entered Carlson's residence. It was model police conduct, deserving of commendation, not condemnation. Although the public cannot always demand, or even expect, model police conduct, it would doubtlessly have been surprised—and disappointed—if the officers had done less.

■ IV. Carlson has a fall back argument. He thinks, even assuming the forced entry was justified, the search should have stopped when he was confronted in his bed and denied knowing of Rita or her whereabouts. It is true that an officer can do no more than is reasonably necessary to ascertain whether someone is in need of assistance (and, if so, to provide that assistance). That point however was not reached when Carlson was confronted in his bed. His response did nothing to clarify his earlier contradictory statements regarding Rita's whereabouts nor did it alleviate the concern raised by the additional unusual circumstances observed by the officers during their attempts to awaken Carlson. The situation clearly remained sufficiently ambiguous to warrant further inquiry. *See* LaFave § 6.6(a), at 399 (and cases cited therein). Pursuant to that further inquiry, Rita's body was found in plain view by the officers in the basement. *See Emerson*, 375 N.W.2d at 259 (plain-view doctrine allows evidence to be seized if the intrusion into an otherwise protected area is justified, the discovery of the object is inadvertent, and the object's incriminating nature is immediately apparent).

The halting point was not reached until Rita's body was discovered.[6] It was precisely at this point that the officers stopped their search and obtained a warrant before proceeding further. The trial court was correct in so ruling.

**AFFIRMED.**

---

**5.** The defendant contends the decision to force entry was made before the police were aware of several of these facts. We note the relevant inquiry under the emergency-aid exception concerns the facts and circumstances known to the police at the time of entry; the question of when the decision to enter was made is irrelevant. *Blades,* 626 A.2d at 279 n. 5.

**6.** An end of the warrantless search would also have been required if and when the officers learned Rita was not on the premises.