# IN THE COURT OF APPEALS OF IOWA

No. 18-1584
Filed March 4, 2020

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**CARRIE ANN CARRE,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Jasper County, Terry Rickers, Judge.


        A defendant appeals her convictions for possession with the intent to deliver methamphetamine and sponsoring a gathering where controlled substances were used. **REVERSED AND REMANDED.**


        Scott M. Wadding of Kemp & Sease, Des Moines, for appellant.

        Thomas J. Miller, Attorney General, and Timothy M. Hau and Bridget A. Chambers, Assistant Attorneys General, for appellee.


        Heard by Bower, C.J., and Tabor, Mullins, May and Greer, JJ.

**TABOR, Judge.**

Carrie Carre appeals her convictions for possession with intent to deliver methamphetamine and sponsoring a gathering where controlled substances were used. She challenges the suppression ruling that allowed the admission of drug evidence discovered following a police officer's warrantless entry into the home she shared with David Putz. For the same reasons we discuss in *State v. Putz*, No. 18-1590, 2020 WL _____, at *___ (Iowa Ct. App. Mar. 4, 2020), also filed today, we reverse Carre's conviction and remand for further proceedings consistent with this opinion.

I.      **Facts and Prior Proceedings**

We glean the following facts from the suppression hearing and the minutes of testimony. After Carre waived her right to a jury trial, the district court relied on those stipulated minutes to find her guilty of possession with intent to deliver less than five grams of methamphetamine and sponsoring a gathering where controlled substances were used.

This case did not start as a drug investigation. It started over concerns for the welfare of fourteen-year-old D.B. Those concerns reached Newton Police Officer Andrew Hansen on December 12, 2016, when he fielded a call from D.B.'s sister.[1] According to Officer Hansen's testimony at the suppression hearing, the sister said D.B.'s mom "was not around. She was in Davenport. [D.B.] was on his own. He was drinking alcohol and going with older males to Sioux City." Rather

---

[1] Our record does not contain any information about the sister's age, her location, or any context for her concerns. Nor does it contain any information about D.B.'s mother other than she was located in Davenport.

than starting an investigation, Officer Hansen advised D.B.'s sister to call the department of human services (DHS).

Two days later, the officer received a call from Jared Lawrence, a DHS child protection worker based in Mahaska County. Lawrence said "he wanted a law enforcement emergency removal done on [D.B.]." Lawrence believed the officer could find D.B. at a Newton residence. Lawrence's information came from Carre, who notified DHS that D.B. was at her home. She reportedly told Lawrence D.B. was "skittish" and "she was doing the best she could to keep him at the residence." Lawrence was prepared to testify that on December 12 he spoke with D.B.'s sister; from that conversation Lawrence understood "[D.B.]'s whereabouts were unknown" and he "had been transient for the past several months." The next day, Lawrence called the Newton School District to see if D.B. was enrolled (he was not). And after receiving Carre's call on December 14, Lawrence contacted Newton police to request a "law enforcement removal" of D.B.

When asked what a law enforcement removal entailed, Officer Hansen said: "There's a situation where a child is in danger. DHS would like [law enforcement] to pick them up right away, and then DHS will find placement for them in a safe environment." The officer did not believe he needed a court order for the "emergency law enforcement removal" sought by DHS. Officer Hansen said Lawrence had spoken with the county attorney's office and "they would fill out the paperwork the next day."

On the same evening he spoke with Lawrence, Officer Hansen went to find D.B. at the house where Carre and Putz lived. The officer knocked at the front door. He testified "a male between fifteen and eighteen years of age" answered

the door.[2]  The officer testified he did not know it then but later learned the person who answered the door was D.B.'s eighteen-year-old brother.  Officer Hansen recalled asking if D.B. was there.  But the occupant walked away without answering.  The officer testified: "I advised him I would need to follow him in."  The officer acknowledged he did not have consent to enter the house.  Rather, the officer reasoned: "I read the body language of the individual I was speaking with, and I knew something was not right.  And he just walked away from me so I went to investigate what was going on."  When asked to elaborate, the Officer Hansen explained, "I was not—I did not feel I needed to run after him.  But the situation was odd, and his lack of emotion and lack of acknowledgement was concerning to me so I followed him in."

The officer followed the teenager to the back of the home where a younger male emerged from a bedroom.  That younger teenager identified himself as D.B.  Officer Hansen told D.B. that he "would need to come with me."

But taking D.B. into custody did not end the officer's involvement.  When the bedroom door opened, the officer smelled "the burnt odor of marijuana."  Then Carre walked out of that bedroom.  When the officer asked about the smell, Carre said D.B. "smoked a bowl to calm down."  Based on that admission, Officer Hansen asked for consent to search.  Carre declined, telling the officer that he "would need a search warrant."

---

[2] A witness for the defense contradicted the officer's version of events.  A.C., Carre's daughter, testified she answered the door that evening and "was surprised to see a cop standing there."

So Officer Hansen sought a search warrant for the entire house. While waiting for the warrant, the officer gathered all the occupants into the living room. Those occupants included Carre, Carre's two daughters, Putz, D.B., DB.'s brother, and another teenager. Officer Hansen also "did a quick visual search" to "make sure there was nobody else in the residence." During that sweep, he noticed a marijuana pipe in another bedroom.

Also while Officer Hansen awaited approval of the search warrant, Carre asked to retrieve some items from the back bedroom and to use the restroom. The officer accompanied her to the bedroom and observed her "frantically searching" for something. Carre grabbed two small bags, a toiletry kit and a tablet cover, and told Officer Hansen she wanted to take them to the bathroom. He asked to search the bags. Agitated at this point, Carre urged the bags held nothing illegal. Still worried that she might destroy evidence or have a weapon, Officer Hansen grabbed for the bags, and Carre resisted. The officer then handcuffed Carre and opened the bags before officers arrived with the search warrant. Inside the toiletry bag, Officer Hansen found a clear baggie containing methamphetamine and five additional baggies of methamphetamine each weighing approximately one gram.

The warranted search of the home uncovered a glass jar with eighteen small bags of marijuana and a safe. The safe had two more glass jars, one with five small bags of marijuana and one with six small bags of marijuana. The safe also had a digital scale and additional plastic bags. Putz claimed ownership of the marijuana.

Based on these discoveries inside Carre's home, the State charged her with delivery or possession with intent to deliver methamphetamine, sponsoring a gathering where controlled substances were used, and delivery or possession with intent to deliver marijuana. She moved to suppress the evidence found at her residence. That motion asserted the officer's entry into Carre's home violated the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution.

After the district court denied that motion, the State amended its trial information to add two counts of distributing controlled substances to minors. Carre waived her right to a jury trial, and the State proceeded with a trial on the minutes of testimony for (1) possession with intent to deliver less than five grams of methamphetamine, in violation of Iowa Code section 124.401(1)(c)(6) (2016), a class "C" felony and (2) sponsoring a gathering where controlled substances were used in violation of section 124.407, a serious misdemeanor. The district court found Carre guilty on those two counts. She now appeals.

II.     **Scope and Standard of Review**

We review de novo this challenge to the suppression ruling because Carre's appeal implicates constitutional issues. *See State v. Baker*, 925 N.W.2d 602, 609 (Iowa 2019). We independently evaluate the totality of the circumstances as shown by the entire record. *Id.* We defer to the district court's factual findings, but they do not bind us. *Id.*

### III. Analysis

In her appeal, Carre challenges three separate actions by the police: (1) the warrantless entry into her home, (2) the warrantless search of her toiletry bag, and (3) the warranted search of her entire residence. Because we grant relief on the first claim, we need not reach the other issues.

Both the Fourth Amendment and article I, section 8 protect against unreasonable searches and seizures.[3] Our supreme court has recognized the preference for search warrants. *See State v. Angel*, 893 N.W.2d 904, 911 (Iowa 2017). That preference is especially strong when defendants challenge a search of their home under the state constitution. *See State v. Short*, 851 N.W.2d 474, 502 (Iowa 2014) (expressing "little interest in allowing the reasonableness clause to be a generalized trump card to override the warrant clause in the context of home searches").

Carre contends Officer Hansen's warrantless entry into her home violated her constitutional rights. We address that contention in a two-step analysis: (1) did Carre have a reasonable expectation of privacy in the area searched and (2) if so, did the State unreasonably invade that protected interest? *See State v. Tyler*, 867 N.W.2d 136, 167 (Iowa 2015). Here, no dispute arises that Carre had a reasonable expectation of privacy in the home she shared with Putz. In fact, the "chief evil" the Fourth Amendment and article I, section 8 each strive to address is such a

---

[3] On appeal, Carre urges a different standard for interpreting the state constitutional provision when discussing consent but not for the other two exceptions to the warrant requirement raised by the State.

warrantless intrusion into a home. *State v. Kern*, 831 N.W.2d 149, 164 (Iowa 2013). So we turn to the reasonableness of the invasion of that protected interest.

"Subject to a few carefully drawn exceptions, warrantless searches and seizures are per se unreasonable." *State v. Lewis*, 675 N.W.2d 516, 522 (Iowa 2004). Courts recognize exceptions to the warrant requirement for searches based on consent, plain view, probable cause coupled with exigent circumstances, searches incident to arrest, and emergency aid. *Id.* The State bears the burden to prove an exception applies. *State v. Watts*, 801 N.W.2d 845, 850 (Iowa 2011).

In the district court, the State argued three exceptions to the warrant requirement: consent, emergency aid, and probable cause (or its equivalent) plus exigent circumstances. The district court rejected the first two exceptions. First, the State did not show Officer Hansen received permission to enter the home: "The Court does not find that opening a door to a police officer operates as consent for the officer to enter the home." Second, the court ruled the emergency-aid exception did not apply because the State did not show the risk of imminent danger:

> Even though Officer Hansen had been dispatched to perform the emergency removal of a minor, the State has failed to show that it was reasonable for Officer Hansen to believe that an emergency existed. At the time he knocked on the front door, he did not know if [D.B.] was still present in the home, or have any knowledge that showed [D.B.] was at risk for death or bodily injury.

So the State was left with the warrant exception for probable cause (or its equivalent) coupled with exigent circumstances. The district court latched onto that rationale, recognizing "the State's strong interest in safely recovering [D.B.]" as a runaway under Iowa Code section 232.19(1)(c) and finding "exigent

circumstances necessary" to enter Carre's residence without a warrant based on her description of the juvenile as "skittish."

On appeal, the State does not resurrect the consent exception but does reprise its community-caretaking argument rejected by the district court, as well as advocating that entry into Carre's home was supported by the equivalent of probable cause coupled with exigent circumstances. We will address each of those exceptions in turn.

## A. Community Caretaking/Emergency Aid

The United States Supreme Court recognized the community-caretaking exception to the warrant requirement in *Cady v. Dombrowski*, holding: "Local police officers . . . engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." 413 U.S. 433, 441 (1973). Community caretaking has three subdivisions: "(1) the emergency aid doctrine, (2) the automobile impoundment/inventory doctrine, and (3) the 'public servant' exception." *Tyler*, 867 N.W.2d at 170. The emergency-aid and public-servant doctrines are "analytically similar"—though critics brand the public-servant category as "amorphous" and at risk of "swallowing up constitutional restrictions on warrantless searches all together." *See State v. Coffman*, 914 N.W.2d 240, 245 (Iowa 2018); *id.* at 263 (Appel, J., dissenting).

In this appeal, the State focuses on the emergency-aid exception, contending "the information available to Hansen would have led a reasonable person to believe emergency action was necessary." It is true, a police officer may enter a home without a warrant to render emergency assistance. *See State v.*

*Emerson*, 375 N.W.2d 256, 258–59 (Iowa 1985). But the admissibility of evidence discovered after that entry hinges on this question—would a reasonable person have believed an emergency existed? *State v. Carlson*, 548 N.W.2d 138, 141 (Iowa 1996); *see also Coffman,* 914 N.W.2d at 257–58 (holding under Iowa Constitution, the State must also show officer "subjectively intend[ed] to engage in community caretaking"). Framed more broadly, we must ask (1) was Officer Hansen conducting bona fide community caretaking activity and (2) did the public's need for that activity outweigh the intrusion on Carre's privacy interest in her home. *See Coffman*, 914 N.W.2d at 244–45.

The district court found insufficient proof the officer's warrantless entry was necessary to rescue or render aid to D.B. After all, Officer Hansen did not know if D.B. was actually at the home when he knocked on the door. Neither did Officer Hansen know if the young man who answered the door was D.B. or was about to alert D.B. to the police presence.[4] In fact, he described the person who answered the door as somewhat older than D.B.—fifteen to eighteen years, rather than D.B.'s fourteen years.

To counter the district court's finding, the State cites *Carlson*, where the police entered the defendant's home, looking for his girlfriend who was reported missing by her distraught daughters. 548 N.W.2d at 142. That missing woman

---

[4] Hansen testified he was the only officer at the scene and "did not want that individual running out the back door." The officer testified while he was not familiar with the Carre residence, it was a "bungalow type house" likely with a "similar layout" to other houses of that style that featured a back door. Despite his familiarity with the bungalow layout—and Carre's warning that D.B. was "skittish"— Officer Hansen did not take the reasonable step of bringing a second officer to the call in case D.B. tried to slip out the back.

was trying to end an abusive relationship with Carlson and, uncharacteristically, did not answer calls from her daughters for two days. *Id.* at 143. Carlson did not answer the officer's knock at the door, but tire tracks in the snow confirmed he was at home. *Id.* (accepting reasonable belief that "it seemed highly likely that some terrible harm had befallen her, requiring a rescue").[5]

The State compares the missing-person report in *Carlson* to the DHS concerns for D.B. The State's comparison is apt on the surface. But digging deeper, the cases bear few similarities. Here, the State offered no evidence D.B. faced any harm inside the Carre residence. As Carre points out on appeal, Officer Hansen candidly testified that nobody present at the house appeared to present a safety concern. In fact, Carre herself had contacted DHS to let child protection workers know D.B. was safe at their home. At oral argument, the State pointed only to the risk of D.B. taking flight from Carre's home, possibly out a back door.

"The emergency-aid exception is subject to strict limitations." *Id.* at 141. This case does not fall within those narrow constructs. We agree Officer Hansen arrived at the Carre residence to conduct bona fide caretaking activity—acting on the DHS request to find a teenager whose sister expressed concerns about his welfare. And we appreciate that peace officers must often react to changing circumstances with little time for introspection. *See U.S. v. Harris*, 747 F.3d 1013,

---

[5] The State also cites *State v. York*, No. 12-0405, 2013 WL 530956, at *5 (Iowa Ct. App. Feb. 12, 2013) in which we approved reliance on the emergency-aid exception when "[a]n intoxicated and suicidal teenager led police to a home where they discovered signs of a forced entry and unresponsive residents." Unlike D.B.'s situation, the facts in that case justified the officers "in fearing for the juvenile's life."

1017–18 (8th Cir. 2014) (recognizing police may be called to "make a split-second decision in the face of an emergency" to protect the public).

But after Officer Hansen knocked on the front door and asked if D.B. was there, the officer switched to investigation mode. He testified the young man's "lack of acknowledgement was concerning to me so I followed him in." The officer's decision to "investigate what was going on" arose from his mere hunch that something was "not right" about the situation. The officer's "read" of that young man's "body language" did not provide a reasonable basis to believe D.B. was present, still less that D.B. faced serious harm inside that home requiring the officer's warrantless entry to render immediate aid. *See Kern*, 831 N.W.2d at 174 (holding community-caretaking exception did not justify police entry into home where officer's motivation was to search for evidence of a crime).

The lack of imminent danger was also evident from the fact that two days earlier Officer Hansen learned of the sister's concerns but did not take any action to find fourteen-year-old D.B. Instead, the officer recommended the sister contact DHS workers to "advise them of the situation." Nothing about the circumstances the officer encountered at Carre's residence corroborated the corrupting influence of "older males" D.B.'s sister mentioned. The State offered no proof that D.B.'s "transient" situation had reached an emergency status that justified police in making a warrantless entry into a third party's home.

Like the district court, we reject the State's reliance on the emergency-aid exception.

**B.      Taking Custody of a Runaway Under Exigent Circumstances**

That rejection leaves us with the State's remaining argument—that Officer Hansen's entry into Carre's home fell under the warrant exception for probable cause coupled with exigent circumstances.  The State does not argue Officer Hansen had probable cause to believe a crime was being committed in Carre's home.  Instead, the State argues—and the district court accepted—that the officer had "the equivalent" of probable cause under the child-welfare chapter.

Generally, probable cause exists to conduct a search if a reasonably prudent person would believe evidence of a crime might be located at that place. *See State v. Nitcher*, 720 N.W.2d 547, 554 (Iowa 2006).  Exigent circumstances generally involve the danger of violence or injury to police officers or others, the risk of the subject's escape, or the probability that evidence will be concealed or destroyed if the officer waits for a warrant to act.  *Id.* at 555.  To decide if an officer faced an exigency that justified acting without a warrant, we look to the totality of circumstances.  *See Missouri v. McNeely*, 569 U.S. 141, 149 (2013).

Although the district court did not believe the State offered sufficient evidence of an emergency for the emergency-aid exception, it nevertheless decided the DHS request that police execute an "emergency removal of a minor" was the "equivalent" of probable cause.  As for exigent circumstances, the district court identified Officer Hansen's reliance on "Carre's own expression of urgency" when describing D.B.'s restlessness and her attempts to keep the teenager at the house.

We start with the probable-cause equivalency.  The district court noted this case was "factually unique" because it did not involve a crime but rather "the

emergency removal of a minor without any type of court or administrative order." The court then cited two provisions—Iowa Code sections 232.19 and 232.79—as "scenarios where a police officer may take a minor into custody." The court decided "the most applicable scenario" was the authorization to seize runaway children. That code section provides:

> A child may be taken into custody . . . [b]y a peace officer, when the peace officer has reasonable grounds[6] to believe the child has run away from the child's parents, guardian, or custodian, for the purposes of determining whether the child shall be reunited with the child's parents, guardian, or custodian, placed in shelter care, or, if the child is a chronic runaway and the county has an approved county runaway treatment plan, placed in a runaway assessment center under section 232.196.

Iowa Code § 232.19(1)(c).

The district court assumed D.B. had "run away" from his parents because the sister reported his mother was in Davenport and he was in Newton.[7] Carre attacks that assumption on appeal. He points out the legislature did not define "runaway" in chapter 232 but did so in the criminal code. The kidnapping chapter defines "a runaway child" as "a person under eighteen years of age who is voluntarily absent from the person's home without the consent of the person's parent, guardian, or custodian." *Id.* § 710.8(1)(c). Carre contends the State failed to prove Officer Hansen had reasonable grounds to believe D.B. was a runaway.

---

[6] The State asserts, and we agree, that the standard of "reasonable grounds" is comparable to the "probable cause" requirement. *See Kraft v. City of Bettendorf*, 359 N.W.2d 466, 469 (Iowa 1984) (equating expression "reasonable ground" in arrest statute to traditional "probable cause").

[7] Carre's daughter, A.C., testified D.B.'s sister had talked to their family "about how [D.B.] hadn't been home much and he'd been running away and he'd just been in some trouble and so we were trying to help him out."

Carre asserts: "The appellate record is devoid of evidence indicating whether D.B. ever ran away or if, instead, his mother left town without him."

We agree the State did not establish that the officer had information to show D.B. was voluntarily absent from his home without parental consent. Nothing in this record shows that between the sister's calls on December 12 and the officer's warrantless entry on December 14, either the DHS or the police tried to contact D.B.'s mother to check on his status. The State presented no evidence to clarify where D.B. was living. The record did show D.B.'s older brother was with him in Newton. The State cannot rely on the runaway-child provision in section 232.19(1)(c) as the equivalence of probable cause that a crime had been committed without proof the officer reasonably believed D.B. had run away from his parents.

In the district court, the State also relied on section 232.79(1). That statute allows an officer to take a child into custody without a court order or parental consent if "the child is in a circumstance or condition that presents an imminent danger to the child's life or health" and "[t]here is not enough time to apply for an order under section 232.78."[8] Hansen's testimony at the suppression hearing points to section 232.79 as the basis for his trip to Carre's residence. The officer cast the DHS request as an "emergency removal" where "a child is in danger."

---

[8] The juvenile court may enter an ex parte order for the temporary removal of a child when (1) a parent or guardian is (a) absent, (b) refuses to consent to the child's removal, or (c) there is reasonable cause to believe that a request for consent to remove the child will further endanger the child or cause the parent or guardian to take flight *and* (2) where it appears that the child's immediate removal is necessary to avoid imminent danger to the child's life or health *and* (3) there is not enough time to file a petition and hold a hearing under section 232.95. *See* Iowa Code § 232.78(1).

But as Carre argues on appeal, the State did not establish D.B. was in "a circumstance or condition" that presented "imminent danger" to his life or health. *Id.* § 232.79(1)(a). Nor did the State show it did not have enough time to apply for an ex parte order from the juvenile court. *See id.* § 232.78. Because we have already rejected the State's community-caretaker theory, we cannot conclude section 232.79 provided the officer authority to enter the Carre residence to remove D.B.

Returning to the State's theory that D.B. was a runaway, even if Officer Hansen had reasonable grounds to believe that was true, section 232.19(1)(c) only authorized the officer to apprehend the child. *See State v. Ahern*, 227 N.W.2d 164, 167 (Iowa 1975) (holding code section "allows a peace officer to take into immediate custody a runaway child"). It did not separately permit the officer to cross the threshold into a third party's home to take the juvenile into custody. As the *Ahern* court cautioned: "Of course, that section may not authorize deprivation of fourth amendment protections." *Id.*

Even if the State could rely on the runaway-child provision as the equivalent of probable cause, we cannot find exigent circumstances paved the officer's entry into Carre's home. The State must advance "specific, articulable grounds" to support a finding of exigent circumstances. *Watts*, 801 N.W.2d at 851. In the context of entering a home without a warrant to make an arrest, a finding of exigency requires courts to consider these important, but not all-inclusive criteria:

> (1) a grave offense is involved;
> (2) the suspect is reasonably believed to be armed;
> (3) there is probable cause to believe the suspect committed the crime;
> (4) there is strong reason to believe he is on the premises;

(5) there is a strong likelihood of escape if not apprehended; and

(6) the entry, though not consented to, is peaceable.

*State v. Luloff,* 325 N.W.2d 103, 105 (Iowa 1982).

The State acknowledges "the situation presented here does not fit perfectly into the *Luloff* factors." Still, the State contends the record supports a finding of exigent circumstances because fourteen-year-old D.B. had been "transient" for several months, was not enrolled in the Newton schools, and was "known to be drinking and traveling to a distant part of the state with older men." While those circumstances are indeed concerning, they are not exigent. *See Exigent,* Black's Law Dictionary (10th ed. 2014) ("[r]equiring immediate action or aid, urgent").

When viewed in its totality, the record here does not support the district court's finding of exigent circumstances. The district court focused on Carre's description of D.B. as "skittish" to presume he was a "flight risk." But as the district court recognized, Officer Hansen did not know if D.B. was still present in the home when he knocked on the front door. And the officer had no information that D.B. faced imminent danger if he was still inside the home or, conversely, that he faced imminent danger if he left the home. This situation was not akin to a suspect who committed a felony offense and would likely escape if not apprehended. *See Jones*, 274 N.W.2d at 276. Here, a sister expressed concern her teenage brother was "on his own" and making bad choices. The officer originally diverted her concerns to DHS.

DHS learned from Carre that D.B. was present in her home and that she would try to keep him there. Dispatched to that house, the officer knocked on the door. When an occupant, who appeared to be in his teens answered, the officer

did not ask for Carre so that she could confirm D.B.'s presence in her home. Instead, based on that teenager's body language, the officer felt compelled to walk into the house without consent. That situation did not amount to exigent circumstances.

Both the Fourth Amendment and article I, section 8 draw a "firm line at the entrance to the house." *See Watts*, 801 N.W.2d at 852 (quoting *Payton v. New York*, 445 U.S. 573, 590 (1980)). Without exigent circumstances, an officer may not cross that threshold without a warrant. *Id.* Here, the State failed to show specific, articulable grounds to support a finding of exigent circumstances to justify Officer Hansen's entry.

Because the State did not establish an exception to the warrant requirement justifying the officer's entry, all evidence discovered in Carre's home must be suppressed. *See Luloff*, 325 N.W.2d at 106 ("Information gained during the illegal entry led to the discovery of evidence that formed the basis for the search warrant. The exclusionary rule bars the use of both evidence directly seized in an illegal search and evidence discovered indirectly through the use of evidence or information gained in the illegal search."). We reverse the suppression ruling and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

Bower, C.J., and Mullins, J., concur; May, J., concurs specially; and Greer, J., partially dissents.

**MAY, Judge** (specially concurring).

I agree we must reverse because (1) Officer Hansen entered a home without a warrant and (2) the State failed to prove any recognized exception to the warrant requirement. I write separately to mention two points, both relating to the community-caretaking exception.

First, the majority suggests Officer Hansen's motive for entering the home was to investigate crime rather than to engage in community caretaking. I respectfully disagree. Instead, I accept the district court's conclusion that Officer Hansen's "sole motivation in entering the defendants' residence was to find [D.B.,] a runaway child who was reportedly engaged in dangerous behavior and who was prone to evade authorities." This view finds support in the hearing transcript.[9] And, importantly, it was the conclusion of the suppression judge, who had the advantage of seeing and hearing Officer Hansen testify in person. *See State v. Vance*, 790 N.W.2d 775, 780 (Iowa 2010) (noting "[w]e give deference to the district court's findings of fact due to its ability to assess the credibility of the witnesses" including factual findings made following suppression hearings).

---

[9] According to the transcript, Officer Hansen testified as follows:

> Q. Officer Hansen, it's true that at this time you made the decision to enter the house without a warrant, is that correct? A. Yes.
>
> Q. Can you articulate for the court at this time why you followed the teenager into the home? A. I did not know if [the teenager who had answered the door and then walked away] was actually [D.B.], and I did not want that [teenager] running out the book [sic] door.

Although Officer Hansen also used the verb "investigate" when explaining his reasons for entering the home, I read those comments to mean the officer was gaining more information relating to D.B.'s situation, not investigating crime. *Cf. United States v. Quezada*, 448 F.3d 1005, 1008 (8th Cir. 2006) (applying the community-caretaker exception when a deputy "entered the apartment to *investigate* a possible emergency situation" (emphasis added)).

Second, the dissent suggests "the public need and interest outweigh[ed] the intrusion upon the privacy of the citizen" and, therefore, justified Officer Hansen's entry of the home. *State v. Crawford*, 659 N.W.2d 537, 543 (Iowa 2003). I respectfully disagree.

The word "home" deserves emphasis. Unlike many community-caretaking cases, this one does not involve an automobile in a public area. Rather, this case is about a home. And, as Justice Scalia put it, "when it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). "At the Amendment's 'very core' stands 'the right of a [person] to retreat into [their] own home and there be free from unreasonable governmental intrusion.'" *Id.* (citation omitted). Indeed, as the majority notes, "warrantless invasion of the home was the 'chief evil' the Fourth Amendment and article I, section 8 each sought to address." *State v. Kern*, 831 N.W.2d 149, 164 (Iowa 2013).

So when a police officer walks into a citizen's home without a warrant or invitation[10] or even permission, that entry constitutes a substantial "intrusion upon the privacy of the citizen." *Crawford*, 659 N.W.2d at 543.

But did the "public need and interest" justify that kind of intrusion? *See id.* Certainly there are cases when it could. "A police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that *an emergency* exists requiring his or her attention." *Quezada*, 448 F.3d

---

[10] Although Carre had contacted the department of human services to let them know D.H. was at the home, neither she nor Putz contacted the police. Certainly, neither Carre nor Putz asked the police to walk into their home.

at 1007 (emphasis added). As I read the record, though, I do not believe that was the situation here. Instead, the record supports the suppression judge's finding that:

> Even though Officer Hansen had been dispatched to perform the emergency removal of a minor, the State has failed to show that it was reasonable for Officer Hansen to believe that an emergency existed. At the time he knocked on the front door, he did not know if [D.H.] was still present in the home, or have any knowledge that showed [D.H.] was at risk for death or bodily injury.

So, like the district court and the majority, I conclude the community-caretaking exception does not apply.

**GREER, Judge** (concurring in part and dissenting in part).

I respectfully dissent in part. We must define the parameters of a police officer's warrantless entry into a home for the pure motive of retrieving a reported runaway juvenile. While I recognize the sanctity of privacy in the home, here we must balance that right against a police officer's emergency directive from the Iowa Department of Human Services (DHS) to locate an at-risk, fourteen-year-old child and bring him to a safe environment. Or to put it more simply, can a police officer rely upon another state agency's emergency determination as a reasonable basis to enter a home without requiring a separate full emergency analysis by the entering officer? To address the issues, the State points to exceptions to the warrant requirement that supported the officer's actions: probable cause coupled with exigent circumstances and the community-caretaking exception. In the end, Carre argues the both the warrantless entry into her home and the later search for drugs were unconstitutional.

I agree with the majority that there was not probable cause with exigent circumstances to support the warrantless entry. Officer Hansen did not have probable cause to believe a crime had been committed or that a crime would be found when he entered the house even though the exigent circumstance—risk of the subject's escape—was a valid concern. *State v. Watts*, 801 N.W.2d 845, 851 (Iowa 2011) ("Exigent circumstances sufficient to justify a search and seizure without a warrant usually include . . . risk of the subject's escape . . . ." (quoting *State v. Jackson*, 210 N.W.2d 537, 540 (Iowa 1973)); *see also State v. Ahern*, 227 N.W.2d 164, 167–68 (Iowa 1975) (noting that circumstances involving the

apprehension of a runaway child could be a contributing factor in creating exigent circumstances).

But the State also argues the community-caretaking exception to the warrant requirement applies here and justifies the warrantless entry. Because this limited factual situation involves the officer's sole motive of retrieving a child as opposed to investigating a crime, I would apply the community-caretaking exception. For that reason, I respectfully dissent in part and would affirm the suppression ruling on that basis.

"[L]ocal police officers . . . frequently 'engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *State v. Crawford*, 659 N.W.2d 537, 541 (Iowa 2003) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). "[W]hen in the performance of such duties they come upon evidence of crime, it does not violate the Fourth Amendment to gather it for purposes of preparing a criminal prosecution." *State v. Moore*, 609 N.W.2d 502, 504 (Iowa 2000). The Iowa Supreme Court has also adopted the community-caretaking exception under the Iowa Constitution. *See, e.g.*, *State v. Coffman*, 914 N.W.2d 240, 254 (Iowa 2018) (discussing the community-caretaking exception under article I, section 8).

"[T]he community caretaking exception encompasses three separate doctrines: (1) the emergency aid doctrine, (2) the automobile impoundment/inventory doctrine, and (3) the 'public servant' exception noted in *Cady*." *Crawford*, 659 N.W.2d at 541. Only the emergency-aid and public-servant doctrines conceivably apply here. I recognize that the State mainly addressed the

emergency-aid doctrine of the community-caretaking exception as opposed to the public-servant doctrine. Yet they are closely related and analytically similar. *Coffman*, 914 N.W.2d at 244–45 ("The emergency-aid and public-servant doctrines are closely related."). For that reason, I will consider the officer's conduct with both doctrines in mind.

The difference between the emergency-aid and public-servant doctrines been described as follows,

> [O]nly a narrow distinction separates the emergency aid doctrine from the public servant exception. Under the emergency aid doctrine, the officer has an immediate, reasonable belief that a serious, dangerous event is occurring. . . . [I]n contrast, the officer in a public servant situation might or might not believe that there is a difficulty requiring his general assistance. For example, an officer assists a motorist with a flat tire under the public servant doctrine, but an officer providing first aid to a person slumped over the steering wheel with a bleeding gash on his head acts pursuant to the emergency aid doctrine.

*Crawford*, 659 N.W.2d at 541–42 (quoting Mary E. Naumann, *The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception*, 26 Am. J. Crim. L. 325, 333–34 (1999) [hereinafter Naumann]).

One author described police conduct that has been covered by the public service doctrine in cases across the country as follows,

> The public servant exception has evolved to allow police action in two principal areas. First, the doctrine supports relatively minor or regular interactions with the police: approaching parked cars when the driver appears incapacitated or sick or the car is functioning improperly and approaching pedestrians who appear lost, in danger, or ill. These interactions also encompass standard police actions that do not involve criminal investigations, such as responding to citizen complaints and requests for assistance. Second, caretaking activities can involve more intrusive actions such as entering the homes of residents causing disturbances and pulling over moving vehicles when the driver appears to be in trouble or the car seems to be damaged or not operating correctly. Not all police actions,

however, fit neatly into even these broad categories. Generally, any time an officer approaches a vehicle, person, or house without a motivation to investigate a crime and is reasonably justified to do so under the circumstances, the courts are likely to find a legitimate restraint of liberty under the community caretaker doctrine and will allow a subsequent intrusion with its own justification.

Naumann, 26 Am. J. Crim. L. at 339–41 (footnotes omitted).

To determine whether the community-caretaking exception applies, we "require a three-step analysis: (1) was there a seizure within the meaning of the Fourth Amendment?; (2) if so, was the police conduct bona fide community caretaker activity?; and (3) if so, did the public need and interest outweigh the intrusion upon the privacy of the citizen?" *Crawford*, 659 N.W.2d at 543.

There is no dispute there was a seizure under the Fourth Amendment and article I, section 8. *Id.* ("Implicit in any community caretaking case is the fact that there has been a seizure within the meaning of the Fourth Amendment. Otherwise there would be no need to apply a community caretaking exception."). Our inquiry focuses on whether Officer Hansen's conduct was a bona fide community-caretaking activity and whether the public interest outweighed the intrusion into Carre's privacy. "Every community caretaking case must be assessed according to its own unique set of facts and circumstances." *State v. Kurth*, 813 N.W.2d 270, 277 (Iowa 2012).

## I. Bona Fide Community-Caretaking Activity.

The majority concedes Officer Hansen arrived at the residence to conduct bona fide caretaking activity. I agree. But our conflict comes in the analysis of the officer's conduct once he crossed the threshold into the home.

To determine whether there was a bona fide community-caretaking activity under the Fourth Amendment, we will consider whether "the facts available to the officer at the time of the [seizure] would lead a reasonable person to believe that the action taken by the officer was appropriate." *Coffman*, 914 N.W.2d at 252–53 (quoting *State v. Tague*, 676 N.W.2d 197, 204 (Iowa 2004)). Carre has raised an article I, section 8 claim as well. To establish the community-caretaking exception applies under the Iowa Constitution, the State must "prove both that the objective facts satisfy the standards for community caretaking and that the officer subjectively intended to engage in community caretaking." *Coffman*, 914 N.W.2d at 257–58.

Officer Hansen went to the house at DHS's request to conduct the emergency removal of an at-risk child. The child had been missing for several months, living in different places, engaging in illegal behavior (drinking alcohol), and leaving the general area with older adult males. Officer Hansen had a reasonable belief the child was in the home because Carre had notified DHS the child was there. He had also spoken to the child's sister, who described the child's risky behaviors, and he knew that the child was "skittish."

When the officer arrived at the home, he was ignorant of the presence of marijuana. The officer was greeted at the front door by a young man, who appeared to be between fifteen and eighteen years old, who did not respond to the officer's inquiries and walked away, leaving the door open. At that point, the officer did not know what D.B. looked like, did not know that D.B.'s brother would be at the home, and was not sure if the young man he was talking to was D.B. The officer found the young man's actions "odd," and while the young man did not

appear to be a safety concern, the officer testified, "I read the body language of the individual I was speaking with, and I knew something was not right[,]" and the officer "felt something was going on that required me to follow him." The officer believed that if this person was D.B., he may try to flee out the back of the house.

The majority, focusing on the exchange between the unknown young male and the officer at the front door, finds Officer Hansen's conduct switched from caretaking to investigating once he entered the home. I disagree and conclude the caretaking function continued until he located D.B., at which point he smelled marijuana.

The totality of the circumstances support a bona fide community-caretaking mission in the officer's entry into the home. The officer's only purpose in going to the house was to find D.B. The specific, articulable facts available to the officer when he entered the home were: (1) the sister's concerns about her young brother prompting a DHS investigation; (2) Carre describing the juvenile as "skittish"; (3) allegations the juvenile engaged in harmful behavior including drinking, which could affect his safety or the safety of the public; (4) that after a child protection worker investigated the child's situation, DHS requested *emergency* removal;[11] and (5) that the juvenile had been missing for a few months with previous behaviors

---

[11] Officer Hansen testified he believed the purpose of an emergency law enforcement removal was to return a child to a safe environment and meant that the child was in danger. Officers should be commended for such caretaking efforts as opposed to ignoring a DHS emergency directive. *State v. Carlson*, 548 N.W.2d 138, 143 (Iowa 1996) (noting that officers' actions in entering a home to locate missing person was "model police conduct, deserving of commendation, not condemnation. Although the public cannot always demand, or even expect, model police conduct, it would doubtlessly have been surprised—and disappointed—if the officers had done less.").

of going to an unknown location in Sioux City with adults.[12] The risk of flight and the allegations of behavior potentially dangerous to the minor's health are both objective and subjective considerations weighed by this officer.

Helping DHS locate children in need fits the peg of a community-caretaking role. *See State v. Kern*, 831 N.W2d 149, 173–74 (Iowa 2013) ("The caretaking by the police in accompanying the DHS officer to Kern's home ended when the DHS officer and the police officers removed the children from the home."); *see also United States v. Quezada*, 448 F.3d 1005, 1008 (8th Cir. 2006) (concluding that an officer's entry into a home fell under the community-caretaking exception because the officer's observations of an entry door that easily pushed open, the television on, and no answer to officer's inquires supported reasonable belief someone might be inside requiring aid). Reliance on an investigating agency's determination of emergency must be given more weight under these particular facts. Officer Hansen entered the home with the sole purpose of finding D.B. He continued in this community-caretaking function until he located the child. It was at the moment he located D.B. that he smelled marijuana, which changed the officer's function from one of community caretaking to one of investigation of a crime. For all of these reasons, the officer's actions in entering the home to locate the missing juvenile were bona fide community-caretaking activities.

---

[12] No one from DHS testified at the suppression hearing, and we are without the benefit of knowing all of the information DHS had that necessitated an emergency removal of the juvenile.

## II. Balancing Public and Private Interests.

Finally, we must consider whether the officer's actions were reasonable "by balancing the public need and interest furthered by the police conduct against the degree and nature of the intrusion upon the privacy of the citizen." *Crawford*, 659 N.W.2d at 542–43. "[T]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." *Id.* at 441 (quoting *Cady*, 413 U.S. at 447).

"Iowans expect law enforcement on patrol to offer a helping hand." *Coffman*, 914 N.W2d at 258. Likewise, Iowans expect those same officers to protect and provide a safe environment to children, especially at-risk children. The public interest in ensuring the safety of juveniles and preventing them from engaging in criminal behavior that could endanger them or the public is significant and worth protecting as a pure community-caretaking effort.

Under the circumstances here, the public need to conduct an emergency removal of a runaway child to return the child to a safe environment is a public need and interest that outweighs the intrusion to Carre. That the officer could have chosen to take a different action does not render his actions unreasonable. And when determining no "emergency" existed, while the suppression judge opined that as the officer knocked on the front door, he had no knowledge if the child was present in the home or if the child was at risk for death or bodily injury, it is the totality of circumstances immediately facing an officer, and not magic words, that should guide our review.

The majority raises a concern a police officer might use his or her caretaking responsibilities as a pretext for entering a residence. As our supreme court noted,

there is a lack of case authority to help clarify the scope of this doctrine. *See Kurth*, 813 N.W.2d at 273–74. But if narrowed to the specific facts of this case, where both the objective and subjective facts establish that the officer is only operating for the genuine public interest and not involved in the investigation of a crime, no abuse would occur. When directed by DHS and the homeowner to retrieve a missing juvenile, one could argue it would be poor police work to stand at the door and allow the young juvenile to flee out the back.

As a result, I would find that the officer's entry into the home retrieve a missing juvenile falls under the community-caretaking exception under both United States and Iowa Constitutions. For that reason, I would affirm on this issue.